**FIRST HEALTH GROUP CORP., Plaintiff,**

v.

**NATIONAL PRESCRIPTION ADMINISTRATORS, INC., and David W. Norton, Defendants.**

**No. CIV. A. 1CV00312.**

United States District Court, M.D. Pennsylvania.

July 19, 2001.

Scott L. Vernick, Jeffrey D. Hutton,
Fox, Rothschild, O'Brien & Frankel, LLP,

Philadelphia, PA, for First Health Group Corp., plaintiffs.

Thomas B. York, Dilworth Paxson LLP, Christine D. Consiglio, Dilworth Paxson, LLP, Harrisburg, PA, for National Pre-scription Administrators, Inc., David W. Norton, defendants.

### MEMORANDUM

KANE, District Judge.

I. Introduction ............................................................. 198

II. Findings of Fact ......................................................... 199

III. Discussion and Conclusions of Law ....................................... 215
 A. Choice of Law ...................................................... 215
 B. Legal Standards for Injunctive Relief .............................. 216
 C. Probability of Success on the Merits ............................... 216
 1. First Health v. Norton and NPA—Misappropriation of Trade Secrets ..... 216
 2. First Health v. Norton—Breach of Contract ..................... 228
 3. First Health v. Norton—Intentional Interference with Prospective
 Contractual Relationship ...................................... 231
 4. First Health v. NPA—Intentional Interference with Prospective
 Contractual Relations ......................................... 233
 5. First Health v. NPA—Intentional Interference with Contractual
 Relations ..................................................... 233
 D. Irreparable Harm ................................................... 234
 1. First Health v. Norton and NPA—Misappropriation of Trade Secrets ..... 236
 2. First Health v. Norton—Breach of Contract ..................... 237
 3. Tortious Interference Claims .................................. 237

IV. Conclusion .............................................................. 238

## I. Introduction

Plaintiff First Health Group Corp. ("First Health") initiated this diversity action against David W. Norton ("Norton") and National Prescription Administrators, Inc. ("NPA"), by filing a complaint, motion for temporary restraining order, motion for preliminary injunction, and motion for expedited discovery on February 22, 2000. Plaintiff's complaint alleges claims of breach of contract, misappropriation of trade secrets, breach of fiduciary duty, tortious interference with contract, and tortious interference with a prospective economic advantage, against Norton and NPA, arising out of NPA's successful 1999 bid to manage and administer Pennsylvania's Pharmaceutical Assistance Contract for the Elderly ("PACE") program. Plaintiff's claims against Norton arise out of his role as a former employee of First Health (and officer-in-charge of the PACE program) and his later role as a consultant to NPA in connection with the preparation of its successful 1999 bid to manage and administer the PACE program.

The Court denied Plaintiff's motion for a temporary restraining order on February 23, 2000, and held a hearing on Plaintiff's motion for preliminary injunction on May 15–18 and 24, 2000. Based on the testimony presented and documentary evidence introduced at the hearing, and upon consideration of the briefs and proposed factual findings submitted by the parties, the Court makes the following findings of fact and conclusions of law. For the reasons set forth below, the court will deny Plaintiff's motion for a preliminary injunction.

## II. Findings of Fact

*Background*

1. In 1983, the General Assembly of the Commonwealth of Pennsylvania enacted legislation that established the PACE program to provide prescription drugs to eligible senior citizens.

2. The Pennsylvania Department of Aging ("PDA") administers the program through a contractor. The contractor maintains operations to determine cardholder eligibility, provide cardholder services, enroll providers, maintain provider relations, adjudicate on-line claims, administer clinical programs (such as retrospective and prospective drug utilization review, disease state management programs, and establishment of drug formularies), administer manufacturers' rebates, and manage PDA's funding stream.

3. First Health Group Corporation is the parent company of First Health Services Corporation. First Health Services Corporation is a national company that manages and administers, in approximately twenty-two (22) states, Medicaid and other public assistance programs including, but not limited to, government-funded entitlement programs. First Health Services Corporation derives an important part of its business from government-funded pharmacy benefit programs. First Health Group Corporation (operating through First Health Services Corporation) is currently the contract administrator for government-funded programs that provide prescription drug benefits for the elderly, such as the New York EPIC program and PACE.[1]

4. First Health submitted a bid proposal in response to the initial RFP issued by the PDA for the PACE program in 1983, and was awarded the contract.

5. Since 1983, First Health has been the only contractor to manage and administer the PACE program, having won three (3) subsequent bids in 1987, 1990 and 1995. The contract term of the PACE contract entered into between PDA and First Health in 1995 was originally three years. In 1998, PDA extended its contract with First Health for the two year period from 1998–2000.

6. Thomas Snedden ("Snedden"), Director of the PACE program for PDA, has consistently given First Health an "A-plus" rating with respect to First Health's performance under the PACE contract.

7. In each and every re-procurement of the PACE contract before 1999, First Health had always been the lowest bidder.

8. Ninety-five percent of NPA's business is as an administrator of commercial health care benefit programs. NPA has never managed or administered either the PACE program or a comparable government-funded entitlement program.

*PACE Contract*

9. Relevant portions of the contract between First Health and the PDA read:

 a. The Department maintains full ownership rights to the administrative and operating system. The Contractor understands and agrees that all computer programs, manual procedures, operating plans and procedures, documentation, data, records

---

1. For the purposes of this Memorandum and Order, "First Health" will refer interchangeably to the parent corporation, First Health Group Corporation, and its subsidiary First Health Services Corporation.

and related items developed by Contractor for, or used by Contractor in the administration of the PACE program (except for Contractors' or any subcontractors' proprietary software, proprietary software leased or licensed by the Contractor or any subcontractors and those items directly related) are owned without qualification by the Department, and that such ownership of these elements shall continue and remain in the PACE program unimpaired during the term of, and subsequent to termination of this Agreement. Any enhancements to, changes in or augmentation or creation of any such elements during the term of this Agreement shall be owned by the Department without qualification. It shall be a fundamental duty of the Contractor to ensure Department ownership of such elements in such manner and at such times as herein provided.

b. In the event Contractor or subcontractor proprietary software utilities (programs) are utilized in the operation of the system, Contractor agrees upon request by the Department to grant to the Department at the end of [this agreement] a non-exclusive, non-transferable license for three years to use the programs required to operate the PACE system subject to the following conditions: [t]he programs shall only be used by the Department or the Department's successor PACE contractor(s) to operate the PACE system . . . .

c. All computer files, computer programs and related items developed by the Contractor for the program shall be owned fully and without restriction by the Department. . . .

10. While the PDA owns the administrative and operating system, it does not own the way in which the Contractor ties together all the individual elements to manage the PACE program.

11. The contract requires that First Health provide documentation for proprietary software directly affecting the PACE program including "the name of the software vendor, the method of acquisition, the identification of the party responsible for maintenance . . . warranties applicable to the software and the software contract or lease."

12. The contract further requires First Health to deliver to the PDA a description of all manual procedures, including copies of the programs, the instruction manuals and the procedure manuals that are used.

13. On or about September 14, 1999, PDA forwarded the its request for proposals ("1999 RFP") for the contract to manage and administer the PACE program for the period commencing July 1, 2000 to First Health, NPA and other potential bidders.

14. Norton was not on PDA's list of potential bidders for the PACE contract, and did not receive a copy of the 1999 RFP from PDA.

15. The 1999 RFP required all bid proposals to include, among other things, a technical proposal setting forth (i) a statement of understanding, management summary, work plan (addressing the three separate tasks of program takeover, operation and turnover), bidder's experience and personnel (collectively the "technical proposal"); (ii) a proposal to include Socially/Economically Restricted Businesses ("SERB"), and (iii) a cost and price proposal.

16. The 1999 RFP required that all bidders address the PACE program, the PACE needs enhancement tier ("PACENET") program and certain related ancillary programs, such as Chronic Re-

nal Disease, Cystic Fibrosis, Spina Bifida, PKU (a metabolic disorder in children) and a special program for AIDS patients within the Commonwealth of Pennsylvania's Department of Welfare.

*Norton's Employment with First Health*

17. In 1974, The Computer Company (now known as First Health) first hired Norton as an analyst and programmer in its information systems area.

18. From approximately 1990 to 1993, Norton was the vice president and officer-in-charge of the PACE program and was responsible for, among other things, the day-to-day operations of the PACE program and First Health's business relationship with PDA.

19. As part of his job responsibilities, Norton served as the principal liaison between First Health and PDA and Snedden.

20. On or about October 1, 1997, Norton and First Health executed an Employment Agreement (the "Agreement"). The Agreement sets forth the terms of Norton's employment with respect to First Health's pharmacy management and benefits programs, and delineated certain contractual obligations that Norton agreed to honor.

21. In return for executing the Agreement, Norton received the following consideration: (i) a guarantee of one-year of employment, with successive automatic renewals (unless the Agreement was terminated), (ii) participation in First Health's management incentive plan, and (iii) stock options.

22. Section 6 of the Agreement, entitled "Termination," states:

Either party may terminate this Agreement at any time following the Initial Term, without cause and without any liability to [First Health], upon no less than one hundred and twenty (120) day's [sic] prior written notice. In such event, [Norton] if requested by [First Health], will continue to render Employee Services and be paid [Norton's] regular compensation up to the date of termination in accordance with [First Health's] then-current payroll policies and procedures.

23. Section 7 of the Agreement, titled "Confidentiality" states:

Norton agrees not to directly or indirectly use or disclose, for the benefit of any person, firm or entity other than [First Health] and its subsidiary companies, the Confidential Business Information of [First Health]. Confidential Business Information means information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practice, plans, pricing and marketing techniques as well as information regarding [First Health's] past, present, and prospective clients and their particular needs and requirements, and their own confidential information.

Upon termination of employment, with or without cause, [Norton] agrees to return to [First Health] all policy and procedure manuals, records, reports, notes, data, memoranda, and reports of any nature (including computerized and electronically stored information) which are in [Norton's] possession and/or con-

trol which relate to (i) the Confidential Business Information of [First Health], (ii) [Norton's] Employment with [First Health], or (iii) the business activities or facilities of [First Health] or its past, present, or prospective clients.

24. Section 8 of the Agreement, titled "Restrictive Covenant" states, in pertinent part:

For a period of one year after termination of employment, with or without cause, [Norton] will not directly or indirectly, for the purpose of selling services provided or planned by [First Health] at the time the employment was terminated, call upon, solicit or divert any actual customer or prospective customer of [First Health]. An actual customer, for purposes of this Section, is any customer to whom [First Health] has provided services within one year prior to [Norton's] termination. A prospective customer, for purposes of this Section, is any prospective customer to whom [First Health] sought to provide services within one year prior to the date of [Norton's] termination and [Norton] has knowledge of and was involved in such solicitation. For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder.

25. Section 9 of the Agreement, titled "Non–Solicitation of Employees," states:

[Norton] further agrees that for a period of one year from the date of [Norton's] termination, with or without cause, [Norton] shall not directly or indirectly solicit or hire any person who is currently or was an employee of [First Health] at any time during the twelve months prior to [Norton's] termination.

26. Section 10 of the Agreement, titled "Remedies," states:

In the event [Norton] breaches or threatens to breach Section 7, 8 or 9 of this Agreement, [First Health] shall be entitled to injunctive relief, enjoining or restraining such breach or threatened breach. [Norton] acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited.

[Norton] and [First Health] agree that, because of the difficulty of ascertaining the amount of damages in the event that [Norton] breaches Section 9 of this Agreement, [First Health] shall be entitled to recover, at its option, as liquidated damages and not as a penalty, a sum equal to one year's salary of the employee(s) solicited to leave [First Health's] employ. The parties further agree that the existence of this remedy will not preclude [First Health] from seeking or receiving injunctive relief.

[Norton] further agrees that the covenants contained in Sections 7, 8 or 9 shall be construed as separate and independent of other provisions of this Agreement and the existence of any claim by [Norton] against [First Health] shall not constitute a defense to the enforcement by [First Health] of either of these paragraphs.

27. Norton participated in the preparation of First Health's 1990 bid proposal for the PACE contract as a member of First Health's editing team. Particularly, Norton gathered cost information pertaining to the development of a point-of-sale prescription claims processing system for the PACE program.

28. In 1990, after PDA awarded the PACE contract to First Health, Norton developed the point-of-sale prescription

claims processing system for the PACE program.

29. Norton, in his role as vice president and officer-in-charge of the PACE program, was responsible for the general management of First Health's PACE office and staff, as well as the budget and financial information of the PACE program. Norton also prepared cost projections for the contract with PDA, including costs for personnel and equipment, and prepared a budget of the cost to operate First Health's PACE office in Harrisburg, Pennsylvania. Norton implemented a clinical program of prospective drug utilization review, and initiated the development and installation of the imaging system for cardholder eligibility and other documents. Norton gained intimate knowledge of First Health's profit margins with respect to the PACE program.

30. In 1993, First Health promoted Norton to senior vice president of its pharmacy business unit, a position he held until 1998. In this capacity, Norton was responsible for overseeing the management and administration of all of First Health's pharmacy business including, but not limited to, the PACE program. In his capacity as senior vice president of First Health's pharmacy business unit, Norton was responsible for bringing the PACE program's ancillary programs on line, and approved strategic planning for those ancillary programs.

31. Further, in his capacity as senior vice president of First Health's pharmacy business unit, Norton (1) met with PDA representatives and visited First Health's PACE office in Harrisburg every four to six weeks, (2) continuously monitored the operations of the PACE program, (3) knew of the status of the PACE program at any given time, (4) approved strategic planning for the PACE ancillary programs, and (5) discussed with PDA the directions or enhancements that PDA wanted for the PACE program.

32. In his capacity as senior vice president of First Health's pharmacy business unit, Norton was also responsible for all First Health pharmacy contracts including, but not limited to, New York EPIC, Oregon Medicaid, Washington, D.C. Point–of–Service, Virginia Medicaid Point–Of–Service and RetroDUR, Alaska Point–of–Service and RetroDUR and Rebate, South Carolina RetroDUR, North Carolina RetroDUR, Blue Cross/ Blue Shield of North Carolina, Blue Cross of Northeast Pennsylvania, Nebraska Medicaid, Healthpass, TennCare and Promark.

33. In preparing First Health's response to the 1995 RFP for the PACE contract, Norton defined the technical, cost and price strategies for First Health's bid proposal, and determined the enhancements to be added to the PACE program. Norton also wrote and/or edited each section of First Health's bid proposal, and assisted in determining First Health's price for both the capitation and non-capitation proposals that were required by the RFP.

34. In his capacity as senior vice president of First Health's pharmacy business unit, Norton was intimately involved with the preparation of all the bid proposals submitted by the pharmacy business unit including, but not limited to, the technical and cost proposals of First Health's 1995 bid proposal for the PACE contract, and First Health's cost proposal for the 1998–2000 PACE contract extension. Norton knew First Health's profit margins on the PACE program with respect to First Health's cost proposals for the 1995 PACE con-

tract and the 1998–2000 contract extension.

35. Norton gained an intimate knowledge of First Health's costs, pricing and profit margins, and helped First Health win numerous bids for government-funded pharmacy benefit programs including, but not limited to, bids pertaining to the PACE program and the New York EPIC program. Norton prepared the technical and cost proposal strategies for First Health's bid for the New York EPIC contract; more specifically, Norton determined the takeover cost for First Health's takeover cost proposal. In his capacity as senior vice president of First Health's pharmacy business unit, Norton had overall management authority of First Health's takeover of the New York EPIC program, which included a takeover of some of the incumbent contract administrator's staff.

*Norton's Departure from First Health*

36. Sometime between March and June 1999, Norton decided to leave his employment with First Health.

37. On June 7, 1999, First Health sent a letter to Norton that (i) described his severance package, (ii) stated that the effective date of his employment termination was October 28, 1999, and (iii) reminded him to adhere to the restrictive covenants set forth in the Agreement. The letter stated that Norton would be on First Health's payroll until October 28, 1999, yet it also contemplated that he might work for another company before his last day on the payroll at First Health. The letter informs Norton that "[i]f you are employed by another company prior to October 28, 1999, or serve in a consulting capacity, you are not specifically required to notify First Health, although all of the provisions of your Employment Agreement

apply." Norton completed most of his work for First Health in June 1999.

38. In or around April, 1999, Norton met Snedden of the PDA for dinner in Harrisburg and, during their visit, Norton told Snedden that they would not be able to speak for a period of time.

39. In May 1999, Norton and former First Health executive Richard Hofheimer ("Hofheimer") met Snedden for dinner in Harrisburg and discussed, among other things, the potential impact of an outpatient prescription drug benefit under Medicare on state-funded pharmacy assistance programs such as PACE.

40. Between June 1999 and November 1999, Norton and Hofheimer marketed themselves to various companies as consultants interested in (i) assisting a vendor in preparing and submitting a successful bid proposal for the PACE contract, and (ii) maintaining an ongoing business relationship with the successful vendor.

*Norton Approaches NPA*

41. On November 15, 1999, Norton telephoned NPA President Richard Ullman ("Ullman") and offered to assist NPA in the preparation and submission of NPA's 1999 bid proposal for the PACE Contract.

42. On November 17, 1999, Norton attended an in-person interview with NPA senior management representatives Ullman, NPA General Manager Allan Zimmerman ("Zimmerman") and Vice President of Finance Steven Nicoletos ("Nicoletos") for the purpose of discussing Norton's ability to assist NPA in the preparation and submission of its 1999 bid proposal for the PACE contract, and whether or not NPA wanted to retain him as a consultant.

43. During his November 17, 1999 interview with NPA, Norton stated that he was out of work and could help NPA prepare its 1999 bid proposal for the PACE contract. Norton also described his prior employment at First Health, and his intimate knowledge of, and experience with, the PACE program.

44. At the interview Norton told NPA that he would not divulge any confidential information related to anything that First Health had done. Norton further disclosed that he had executed an employment agreement with First Health that contained restrictive covenants.

45. During his interview, Norton provided NPA with a single-page document which he prepared that purported to represent limitations on his future employment. However, the document set forth only Section 7 (confidentiality) and Section 8 (customer non-solicitation) of his Agreement with First Health. The single-page document did not set forth Section 9 (employee non-solicitation) of the Agreement, nor the remainder of the Agreement.

46. Between the November 17, 1999 interview with NPA and NPA's submission of its 1999 bid proposal for the PACE contract on December 10, 1999, Norton did not discuss the restrictive covenants in his First Health Agreement with anyone at NPA. During that time, Norton did not receive anything in writing from NPA that cautioned him to adhere to the restrictive covenants in his First Health Agreement.

47. NPA believed that Norton, as a result of his PACE experience with First Health, could provide information about the PACE program that NPA did not already possess.

48. On or about November 17, 1999, NPA hired Norton as a consultant pursuant to a consulting agreement ("Consulting Agreement"). The Consulting Agreement provided that Norton would provide NPA with consulting services with respect to the preparation and submission of NPA's 1999 bid proposal for the PACE contract.

49. Allen Langjahr, NPA's general counsel, drafted the Consulting Agreement for Norton's execution without first reviewing or examining Norton's contract with First Health or any provisions therein.

50. The Consulting Agreement contains a confidentiality provision that precludes Norton from disclosing NPA's "trade secrets," as the term is defined in the agreement, and a restriction against soliciting employees.

51. As part of his Consulting Agreement with NPA, Norton, in the course of preparing and presenting NPA's bid proposal for the PACE contract, was permitted to use the services of Hofheimer as needed. Norton recommended that NPA retain Hofheimer because Norton believed that Hofheimer could provide valuable assistance to NPA with respect to the drafting and editing of the "Management Summary" portion of NPA's 1999 bid proposal for the PACE contract. NPA retained Hofheimer in mid-November 1999.

52. Over the three-week period when Norton consulted with NPA about PACE, Norton billed NPA a total of one hundred and seventy seven hours, or an average of about sixty hours per week, for the work that he performed in preparing and submitting NPA's 1999 bid proposal for the PACE contract. For the services that he rendered in connection with preparing NPA's bid proposal for the PACE contract, and before NPA's oral interview with PDA, NPA paid Norton approximately $15,000.

53. For the services that he rendered in connection with preparing NPA's bid proposal for the PACE contract, NPA paid Hofheimer approximately $5,000.

*NPA's Bid Proposals*

54. NPA submitted bid proposals for the PACE contract in 1990 and 1995.

55. NPA was not awarded the PACE contract in 1990 or 1995 because PDA's bid proposal evaluation committee gave NPA's technical and cost proposals scores that were significantly lower than the scores given to First Health. PDA determined that NPA's bids were too expensive and poorly prepared.

56. In its 1995 bid proposal, NPA bid a price for the entire PACE contract that was approximately twenty-five percent (25%) higher than the price proposed by First Health.

57. In October, 1999, prior to Norton's arrival at NPA, the draft bid proposal prepared by NPA ("October draft") was little more than a repeat of NPA's 1995 proposal.

58. In October, 1999, before Norton began work for NPA, Peter Grieger, who prepared the losing 1990 and 1995 bid proposals for NPA, went to PDA's procurement library with two other NPA employees to view the 1995 First Health proposal, including its cost proposal section, and the 1998–99 contract extension. Neither Grieger nor the other NPA employees were given access to the cost proposal section of First Health's 1998–2000 contract extension.

59. While working on NPA's 1999 bid proposal, Norton met with Zimmerman on a weekly basis to discuss Norton's recommendations for, and preparation of, NPA's 1999 bid proposal. Norton's responsibilities on NPA's 1999 bid included:

a. preparing a spreadsheet with his estimates of the costs to administer the PACE program, including an estimate of takeover costs based on current PACE contract percentages;

b. following up with Paragon Systems;

c. adding management staffing and takeover section;

d. adding one extra third-party liability coordinator above and beyond First Health's requirement, to obtain more dollars;

e. reading the new NPA takeover section;

f. adding recruitment, hiring incentives and switch vendor notification into NPA's work plan;

g. drafting and/or editing portions of NPA's 1999 technical proposal; and

h. serving as a member of NPA's "red team" of bid proposal reviewers, and therefore "touching" every page of NPA's 1999 bid proposal.

*Officer–in–Charge*

60. Norton recommended to NPA that it propose him as the officer-in-charge of the PACE program.

61. NPA's final 1999 bid proposal for the PACE contract proposes Norton as the officer-in-charge of the PACE program, and states NPA's intention to recruit and hire First Health's current 75—80 member Harrisburg PACE staff.

62. In PDA's answers to the bidders' questions pertaining to the 1999 RFP, PDA stated that it would react "affirmatively" to a bidder proposing to hire many of First Health's current PACE staff.

63. The PACE staff represents a core asset of First Health with respect to its management and administration of public entitlement programs for senior citizens. First Health's PACE staff pos-

sesses skills easily transferrable to other First Health contracts.

64. First Health has invested considerable resources in its PACE employees and their expertise and, in the event of the award of the PACE contract to another vendor, First Health has a retention program through which it would use these employees in other capacities.

*Cost Proposal*

65. Norton worked with Nicoletos in preparing NPA's 1999 cost proposal for the PACE contract, although Nicoletos spent very little time with Norton, and Norton prepared several iterations of NPA's cost proposal.

66. Norton prepared a spreadsheet with preliminary cost numbers and established a methodology for assigning those costs to the ancillary programs that are part of the RFP.

67. The cost proposal of a bid was required to contain a fixed price for each of the three tasks of the program: Takeover, Operations, and Turnover. The costs of each section were then broken down as further required by the RFP.

68. Norton developed the takeover cost number for NPA's 1999 cost proposal for the PACE contract.

69. In the cost buildup that he prepared for NPA's 1999 cost proposal, Norton also prepared estimated preliminary costs for staffing, travel, equipment, supplies, general operating expenses, direct labor, other direct costs and the cost for the maintenance of imaging equipment. However, Nicoletos made changes to Norton's numbers for professional staff.

70. For its 1999 bid proposal, NPA's pricing strategy was to estimate First Health's bid price for the 1999 contract, and then to bid a price that was ten percent less.

71. To estimate First Health's price for the first year of the PACE Contract, NPA reviewed First Health's bid for the 1995–98 contract term (with its cost proposal section), and First Health's total price for the 1998–2000 contract extension (without its cost proposal section), and a March 31, 1997 Dun & Bradstreet report for a company called Health Care Compare ("HCC").

72. The cost proposal section of First Health's 1995 bid reflected that First Health's profit margin was ten percent. To find out whether First Health's profit margin had changed since 1995, Nicoletos turned to the Dun & Bradstreet report. Nicoletos understood, albeit incorrectly, that the March 31, 1997 Dun & Bradstreet report reflected First Health's figures for sales and net income before taxes. From the Dun & Bradstreet Report, Nicoletos calculated that First Health earned about fifty percent profit. Nicoletos thus concluded that, in its 1999 bid, First Health would likely price its bid to include a profit margin of between ten and fifty percent. In order to bid carefully but competitively, Nicoletos chose to assume ten percent as First Health's likely profit on their 1999 bid, and chose that figure as the amount by which he would reduce his estimate of First Health's 1999 bid price.

73. Nicoletos arrived at NPA's final bid price by using the average yearly price as calculated from First Health's 1998–2000 extension, increasing that figure by three percent yearly for inflation and then reducing it by ten percent (First Health's likely profit margin). Although none of the figures in the March 31, 1997 Dun & Bradstreet report for sales and net income before taxes relate to or include First Health's operations, Nicoletos believed that HCC and First Health were the same company, and

that gave him confidence that the ten percent figure was a safe estimate. Nicoletos' reliance on the Dun & Bradstreet Report to estimate the upper level of First Health's likely profit margin was unimportant. The most important basis for Nicoletos' estimate of First Health's profit was the profit margin in the cost proposal of First Health's cost proposal for the 1995–1998 bid.

74. First Health's total price for the 1998–2000 PACE contract extension was $17,691,376, or $8,845,688 per year. The total price bid by First Health in 1999 for the PACE contract was $47,458,112, or $9,491,622.40 per year.

*Information Regarded as Confidential and Proprietary by First Health*

75. Although the 1999 RFP sets forth PDA's general requirements pertaining to the management and administration of the PACE program, First Health, as the incumbent, possessed special knowledge of the preferences of PDA for the PACE program that are not set forth in the 1999 RFP.

76. In order to maintain what it regards as the confidential and proprietary nature of its information pertaining to the administration and management of the PACE program (including costing, pricing, margins, marketing, and the highly specialized procedures, processes, policies, systems and methods of operation, as well as PDA's particular needs, preferences and requirements for that program), First Health

a. requires all of its employees including, but not limited to, its PACE staff, to execute employment agreements that contain clear and precise obligations of confidentiality;

b. limits access to its cost proposals to First Health's senior management in charge of the PACE contract, the financial manager of the PACE contract, and First Health's financial staff;

c. limits the number of individuals who prepare, review or have access to First Health's technical proposals to First Health's key management personnel in Harrisburg and First Health's proposal preparation staff in Richmond, Virginia;

d. stores its technical proposals in a locked library, access to which is limited to certain employees during and after preparation of the proposals;

e. maintains a computerized financial system, access to which is limited to First Health's vice president of finance and his staff at First Health's Richmond, Virginia headquarters, and First Health's parent corporation;

f. limits access to its computer mainframe through an information systems manager and the mandatory use of passwords and identification numbers;

g. enters into contracts with customers that restrict access to First Health's proprietary software; and

h. includes in its bid proposals a statement that the material set forth in the bid proposal is confidential and proprietary business information of First Health.

*Imaging System*

77. First Health uses an imaging system to support the cardholder application and provider enrollment processes, and uses Paragon software and support to do so.

78. Norton, during his tenure at First Health, was responsible for the development of First Health's business relationship with Paragon as it pertained to the PACE program and the New York EPIC program.

79. NPA does not presently use imaging with respect to claims processing, determining cardholder eligibility or routing work flow of documents.

80. By the terms of its contract with PDA, First Health waived any proprietary claim to any computer systems developed for the PACE program.

81. Neither Norton, who developed the relationship with Paragon for First Health, nor Howells, the current First Health officer-in-charge of the PACE program for First Health, considered First Health's relationship with Paragon a secret.

82. There is no evidence of any confidentiality agreement between First Health and Paragon.

83. Paragon's website lists First Health, Harrisburg as a customer.

84. Neither First Health's 1995 bid, nor NPA's October draft, included mention of Paragon as a subcontractor.

85. Norton was the source of NPA's knowledge that First Health used Paragon, and for the suggestion that NPA include Paragon in the bid proposal.

86. Inclusion of this vendor in the bid proposal played a small and unimportant role in PDA's evaluation of NPA's bid.

87. PDA included a detailed discussion of the requirements and specifications of an imaging system in the RFP.

88. NPA learned from Norton that Kodak provided the imaging system for First Health on the PACE project.

89. There is no evidence of a confidentiality agreement between Kodak and First Health.

90. The 1999 RFP discusses the imaging system required by PDA. The RFP states "[d]igital application document

imaging capability must be included in any consideration of the operations of the network." The RFP also provides:

All applications, corresponding documentation and all other correspondence regarding cardholder issues are to be maintained on a digitized image record or displayed on a video screen, reproduced on a printer and communicated between computers.... Detailed design specifications and a summary description of the document imaging system are contained at Appendix Q.

91. PDA's 1999 RFP for the PACE contract does not instruct the bidder to address the current imaging system or how it would be deployed in the takeover work plan of the bidder's proposal.

92. PDA, with respect to bid proposals submitted for the PACE contract, preferred to have the PACE program's imaging system and how it is used in the performance of critical cardholder eligibility determinations addressed in detail in the takeover work plan.

93. Norton, as a result of his tenure as a First Health employee, knew the importance that PDA placed on imaging, and thus, that a bid proposal should address the PACE program's current imaging system and how it is used to perform critical cardholder eligibility functions in a takeover work plan.

94. There is nothing secret or confidential in addressing First Health's imaging system in the takeover plan.

*Takeover Pricing Strategy*

95. The cost NPA proposed in 1999 for takeover [2] of the PACE program, as developed by Norton in NPA's cost proposal, totaled approximately $680,812,

---

**2.** The takeover phase of a contract occurs at the beginning of the contract period and refers to that period of time when a new con-

tractor is gearing up to take over the responsibilities of the incumbent.

excluding corporate overhead and profit margin. NPA's total proposed cost for takeover of the PACE program, including corporate overhead and profit margin, was $718,388. This was significantly lower than the $1.5 million dollars in takeover costs in NPA's 1995 bid proposal.

96. The cost First Health proposed for takeover of the New York EPIC program, which Norton prepared for First Health, totaled $734,702, before adding figures for corporation allocation and profit margin. With corporation allocation and profit margin, the cost proposed by First Health for takeover of the New York EPIC program was $962,912.

97. The figures in First Health's bid for the takeover of the New York EPIC program are secret and confidential.

98. There is no evidence that Norton disclosed, or that NPA used, the figures for First Health's takeover of the New York EPIC program when developing takeover pricing for its bid proposal.

*Turnover Pricing Strategy*

99. NPA bid $759,000 as its cost for turnover [3] in its 1995 bid proposal.

100. In 1999, NPA bid zero dollars as its cost for turnover.

101. First Health's 1995 proposal contained a zero, or near to zero, bid for turnover cost. That information was contained in the cost proposal section of the 1995 bid, which was made available to and viewed by Grieger and two other NPA employees.

102. First Health has a strategy of bidding zero for turnover costs on bids it submits for projects. Norton, as a result of his tenure as a First Health

employee, knew that First Health had a pricing strategy of bidding zero dollars as the cost of turnover in response to proposals to manage and administer government funded entitlement programs. During Norton's tenure at First Health, bidding zero for turnover was a part of First Health's successful bid to take over the New York EPIC program.

*PACE Staff Salary Structure*

103. In its 1999 bid proposal NPA states that, "[b]ased on NPA's review of the information included with the RFP and NPA's experience, NPA's salaries are equivalent, if not higher, to the incumbent's and are competitive for both the greater New York City and Harrisburg markets."

104. First Health's salary structure for its PACE employees is not publicly available, is not contained in First Health's 1995 bid proposal for the PACE program, nor is it contained in the RFP.

105. Norton, as a result of his tenure as a First Health employee, knew First Health's salary structure, particularly with respect to First Health's PACE staff.

106. Norton used information from First Health's salary structure when preparing NPA's bid proposal for the 1999 RFP.

107. NPA's bid proposal was improved by the statement that NPA's salaries are equivalent if not higher than First Health's salaries for its PACE staff. The statement helped convince PDA's bid reviewers that NPA's plan to hire First Health's PACE staff and effect a smooth transition could be successful.

---

**3.** The turnover phase of a contract occurs at the end of the contract period when the in-

cumbent contractor turns the project over to a new contractor.

*Personnel Incentives*

108. NPA included in its 1999 bid proposal incentives to encourage PACE staff to move to NPA. These incentives were (1) to allow the incumbent's staff to join NPA prior to their end date with First Health; (2) to retain the anniversary dates for any of the incumbent's staff with respect to regular raises and performance reviews; and (3) financial incentives for PACE staff to work for NPA.

109. NPA's October 1999 drafts and its 1995 bid proposal contained language indicating that it would encourage current PACE staff to work for NPA, but did not specify what steps NPA would take to encourage such staff continuity.

110. Norton proposed the last two incentives—that NPA retain anniversary dates and offer financial incentives for those PACE staff members who would work for NPA.

111. The use of such incentives is common and general knowledge in the industry.

*Switch Vendors*

112. First Health uses NDC, Envoy and QSI as switch vendors in the PACE program.

113. NPA, in its 1999 bid proposal for the PACE contract, states that NPA will use NDC, Envoy, and QS1 as switch vendors.

114. In NPA's October 1999 draft bid proposal, there is no reference to switch vendors.

115. Neither the 1999 PACE RFP nor First Health's 1995 bid proposal for the PACE contract identified the name of First Health's specific switch vendors.

116. Norton prepared the statement in NPA's 1999 bid proposal for the PACE contract that NPA has links to NDC, Envoy, and QS1.

117. The three switch vendors named in NPA's proposal are the three major switch vendors used by NPA and others in the industry. This information is generally available, and is not secret or proprietary to First Health.

118. There is no evidence of a confidentiality agreement between First Health and NDC, Envoy or QS1.

*PC–SAS*

119. First Health uses PC–SAS for statistical analysis for the PACE program.

120. NPA, in its 1999 bid proposal for the PACE contract, states (i) that PC–SAS should be used as part of a statistical analysis, and (ii) how PC–SAS should be used as a tool for researching and evaluating health care and program outcomes.

121. Neither NPA's October 1999 draft bid proposal, nor NPA's 1995 bid proposal mentions the use or application of PC–SAS.

122. First Health's 1995 bid proposal for the PACE program does not mention PC–SAS.

123. SAS is specifically mentioned in the 1999 RFP.

124. PC–SAS is a commercially available, off-the-shelf product that anyone can purchase for the purpose of performing statistical analyses of data.

*Surveillance Utilization Review System ("SURS")*

125. First Health uses SURS and evaluates SURS analysis results and takes actions responsive to those results.

126. NPA's 1995 bid proposal and 1999 October draft proposal described a SURS system that generated batch reports based on preset criteria.

127. First Health's 1995 contract provides for enhanced drug utilization evaluation.

128. First Health's 1995 contract was publicly available.

129. An enhanced utilization review system is common knowledge, not secret, and not guarded as such by First Health.

130. Grieger wrote this section of the bid proposal for NPA; Norton was not the source for NPA's inclusion for SURS analysis results in its bid proposal.

*Disaster Recovery and Back–Up System*

131. As the officer-in-charge of the PACE program during his tenure at First Health, Norton was responsible for all disaster recovery and back-up procedures.

132. NPA's disaster recovery and back-up plan was upgraded from the version set forth in NPA's October 1999 draft bid proposal to a more expanded final version that is contained in the 1999 bid proposal that NPA submitted to PDA.

133. The improved disaster recovery section was added to NPA's bid proposal by NPA employee Mark Perry.

134. Norton did not reveal any confidential First Health information with respect to the disaster recovery and back up system.

*Manufacturers' Rebate Administration*

135. First Health divides the administrative functions of PACE's manufacturers' rebate program between First Health's business/financial and utilization review departments, using both financial staff and clinical staff.

136. NPA's October 1999 draft bid proposal is silent on where the functions that support the administration of the manufacturers' rebate program should

reside and what staff (financial and/or clinical) should perform the duties.

137. The final version of NPA's 1999 bid proposal, however, divides these functions between NPA's business/financial and utilization review departments.

138. Norton, as a result of his tenure as a First Health employee, established First Health's method of dividing the functions that support the administration of the manufacturers' rebate program between its business/financial and utilization review departments, in order to maximize the recovery of rebates for the client.

139. Norton recommended that NPA divide the functions that support the manufacturers' rebate program between NPA's business/financial and utilization review departments.

140. Splitting the rebates between the two departments is not secret or confidential.

141. Norton used his good management and business judgment when recommending that NPA split the functions.

*On–Line Weekly Status Reports*

142. First Health, in its management and administration of the PACE program, uses on-line reporting for weekly status reports.

143. NPA, in its 1999 bid proposal for the PACE contract, recommended that the weekly status reports be placed on-line.

144. Norton recommended to NPA that it propose the use of on-line weekly status reports in its 1999 bid proposal for the PACE contract.

145. First Health's 1995 bid proposal for the PACE contract does not refer to or propose that weekly status reports be provided to PDA on-line.

146. The RFP showed a clear preference for on-line information, including on-line

files, data, audit information, and status reports.

147. NPA began exploring the use of on-line reporting prior to hiring Norton.

148. The inclusion of on-line reports in the 1999 bid proposal played a small and unimportant role in PDA's evaluation of NPA's bid.

*Provider Training*

149. NPA's 1999 bid provides that (1) NPA will conduct provider training; (2) NPA will meet with PDA to evaluate training needs; (3) NPA will determine whether and how to provide continuing education credit for attendees; (4) NPA will find hotels in which to hold the training; and (5) NPA will permit registration for training programs over the phone.

150. First Health had a similarly comprehensive approach to training.

151. Norton, as a result of his tenure at First Health, had an in-depth knowledge of how First Health performs the function of provider training for the PACE program and PDA's preferences for how provider training is to be conducted.

152. Prior to Norton's work at NPA, NPA's 1995 proposal and October 1999 draft proposal did not provide such a comprehensive training program.

153. Norton developed this program for NPA based on his knowledge of First Health's program.

154. The fact that NPA proposed to provide training itself, instead of employing an outside vendor, played a small and unimportant role in PDA's evaluation of NPA's bid.

155. The practice of making continuing education credits available for those attending, and permitting registration by phone are practices known outside First Health's business are not secret or confidential.

*Imaging Documentation and Procedures*

156. First Health integrates imaging documentation and procedures with the cardholder services procedures manual; this information is known outside First Health.

157. The information about integrating imaging documentation and procedures with the cardholder services procedures manual is of little, if any, importance or value.

158. Norton, as a result of his tenure as a First Health employee, knew of the methods and processes used by First Health for management and administration of the PACE program including, but not limited to, the fact that First Health, after the 1995 RFP for the PACE contract, integrated the imaging documentation and procedures with the cardholder services procedure manual.

159. NPA, in its 1999 bid proposal for the PACE contract, states that it "presumes" that the imaging documentation and procedures for the PACE program are integrated with the cardholder services procedure manual.

160. The fact that the imaging documentation and procedures for the PACE program are integrated with the cardholder services procedure manual is not set forth explicitly in the 1999 RFP, any previous First Health bid proposal, or NPA's 1995 bid proposal.

161. NPA deduced from the RFP that it should integrate the imaging documentation and procedures with the cardholder services procedures manual.

*Remittance Advices*

162. NPA, in its 1999 bid proposal for the PACE contract, states that providers sometimes elect to receive their remittance advices via electronic media.

163. In its 1995 bid proposal for the PACE contract and its October 1999 draft bid proposal, NPA does not state that providers may receive their weekly remittance advices electronically.

164. While the 1999 RFP does not explicitly require that remittance advices be delivered to providers via electronic media, in the section titled "Provider Relations Activities," the RFP refers to "[w]eekly, preparing remittance advices with provider message and electronically ... transmitting the providers reimbursement."

165. First Health's 1995 bid proposal for the PACE program does not state that providers sometimes elect to receive their weekly remittance advices via electronic media.

166. The election by providers to receive their remittance advices via electronic media is a new development in First Health's PACE operation since 1995. Norton, as result of his tenure as a First Health employee, knew that providers sometimes elect to receive their remittance advices via electronic media.

167. NPA used electronic remittance advices for over a decade.

168. The fact that some providers prefer electronic remittance advices is information known to many outside First Health.

169. Providers who prefer electronic remittances are free to disclose their preferences to others.

170. First Health locates the software and processes used in preparation of weekly remittance advices in the provider relations unit.

171. NPA derived from the RFP the fact that the software and processes used in preparation of weekly remittances advices should be located in the provider relations unit.

*Labor Overhead Rates*

172. NPA's 1999 cost proposal set forth a labor overhead rate that was one percentage point less than the labor overhead rate of First Health.

173. In its 1995 bid proposal, NPA's labor overhead rate was equal to, or higher than, the labor overhead rate of First Health.

174. NPA calculated its labor overhead costs for its 1999 bid by adopting the labor overhead rate for another NPA Pennsylvania company.

*PDA's Evaluation and Scoring Of the 1999 Bid Proposals*

175. PDA evaluated bid proposals on the basis of three categories: Technical Proposal (60%); Participation of Socially–Economically Restricted Businesses ("SERB") (10%); and Costs (30%).

176. Snedden, in evaluating a bid proposal, focuses on whether a bidder communicates a sense of familiarity with the PACE program's operations, and looks for a sense of comfort and confidence that the bidder will be able to execute on its proposal.

177. Major improvements in NPA's 1999 bid proposal were a direct result of Norton's involvement in the preparation of the bid proposal.

*NPA's February 2, 2000 Oral Interview with PDA*

178. Norton was NPA's primary spokesperson at NPA's oral interview with PDA on February 2, 2000.

179. Snedden, during the oral interview with NPA, requested a complete copy of Norton's employment agreement with First Health; instead, Norton only provided a single-page document that he prepared that set forth Sections 7 and 8 of the Agreement—the same incomplete

document that Norton had provided to NPA at his initial interview. *See* fact # 45, *supra.*

180. PDA did not receive a complete copy of Norton's employment agreement with First Health until after PDA completed the scoring of the bid proposals.

181. During the oral interview with PDA, Norton repeatedly emphasized and discussed NPA's plans to hire all of First Health's PACE staff.

182. On February 2, 2000, after NPA's oral interview, PDA completed its scoring of the technical proposals submitted by First Health and NPA, and then added (i) the SERB scores (which were calculated by the Department of General Services' Bureau of Contract Administration and Business Development) and (ii) the scores for the cost proposals. On or about February 3, 2000, PDA informed NPA that it had received the highest score in the evaluation of the bid proposals.

*Robert Howells*

183. On February 3, 2000, Norton telephoned Robert Howells, a First Health employee and current officer-in-charge of the PACE program.

184. Norton and Howells were friends, and as such spoke on the telephone from time to time.

185. During their conversation, Norton told Howells that NPA intended to recruit and hire First Health's current PACE staff.

186. During his conversation with Norton on February 3, 2000, Howells asked Norton if Howells was included in the list of First Health PACE staff that NPA intended to recruit and hire. Norton responded by stating "sure," and that Howells did not "have anything to worry about."

*First Health's Bid Protest*

187. On February 9, 2000, pursuant to the Field Procurement Handbook of the Commonwealth of Pennsylvania Department of General Services, First Health filed a bid protest with PDA that objects to the award of the PACE contract to NPA. This administrative appeal is currently pending before the PDA but has been stayed by the administrative agency pending the outcome of this action. First Health continues to administer the PACE program, pending the outcome of the bid protest.

## III. Discussion and Conclusions of Law

### A. Choice of Law

The Employment Agreement executed by First Health and Norton contains a choice of law section selecting Illinois as the law under which the contract is to be governed. Agreement § 15. When, as here, a federal court sits in diversity, it applies the substantive law of the forum. *Clark v. Modern Group Ltd.,* 9 F.3d 321, 326 (3d Cir.1993); *Greenberg v. Tomlin,* 816 F.Supp. 1039, 1057 n. 10 (E.D.Pa. 1993). Therefore, this Court will apply Pennsylvania choice of law when determining what law governs the claims arising out of the Agreement. Pennsylvania law is clear that the Court shall respect the choice of law expressed by the parties in the contract. *See Assicurazioni Generali, S.P.A. v. Clover,* 195 F.3d 161, 165 (3d Cir.1999) ("a contract's references to the laws of a particular state may provide persuasive evidence that the parties to the contract intended for that state's law to apply."). This Court will therefore use Illinois law when analyzing First Health's claims against Norton governed by the contract, that is, the claims against Norton for misappropriation of trade secrets and breach of contract.

■ First Health raises claims of misappropriation of trade secrets and tortious interference with contract against NPA. Although these claims originate in First Health's contract rights arising from the Agreement with Norton, NPA is not a party to the contract, and did not elect to be bound by the laws of Illinois. The question is raised, then, of whether the law of Pennsylvania or Illinois applies to claims against NPA. Under Pennsylvania conflict of law principles, this Court "first must determine whether a true conflict exists between the laws of the two states[.]" *Rosen v. Tesoro Petroleum Corp.*, 399 Pa.Super. 226, 582 A.2d 27, 30 (1990). Should there be a difference between the law of the two states, then,

> for substantive tort law issues, Pennsylvania uses a combination of the government interest and significant relationship approaches to conflict of laws analysis. Under this analysis, a court must evaluate the extent to which one state, rather than another has demonstrated, by reason of its policies and their connections and relevance to the matter in dispute, a priority of interest in the application of its rule of law.

*Troxel v. A.I. duPont Institute*, 431 Pa.Super. 464, 636 A.2d 1179, 1181 (1994) (internal quotation marks omitted). The law of Illinois and the law of Pennsylvania on these issues do not differ in any material way as applied to this case. Therefore, there is no true conflict, and it is unnecessary for this Court to embark on a full choice of law analysis. Since NPA was never a party to a choice of law clause in the contract between First Health and Norton this Court will apply Pennsylvania law to claims against NPA.

■ The claims for tortious interference with prospective economic advantages against both Norton and NPA will be governed by Pennsylvania law, as these claims do not arise directly from Norton's Agreement, but from First Health's potential contract for the PACE program with PDA.

### B. Legal Standards for Injunctive Relief

■ This Court uses a federal standard in examining requests for preliminary injunctions. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir.1989). Because preliminary injunctive relief represents an extraordinary remedy, Plaintiff's burden to demonstrate that it is entitled to relief is a heavy one. *See United States v. City of Philadelphia*, 644 F.2d 187, 191 n. 1 (3d Cir.1980). In deciding whether an injunction should issue, the Court weighs four factors: (1) whether the movant has demonstrated a reasonable probability of success on the merits; (2) whether the movant will suffer irreparable injury if the injunction does not issue; (3) whether granting the injunction will result in even greater harm to the nonmoving party; and (4) whether granting the injunction serves the public interest. *See Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir.1994).

### C. Probability of Success on the Merits

The Court will first address Plaintiff's likelihood of success on the merits, with an assessment of each of Plaintiff's claims in light of the law applicable to each.

### 1. First Health v. Norton and NPA— Misappropriation of Trade Secrets

First Health asserts a misappropriation of trade secrets claim against Norton and NPA. First Health argues that the bidding and management methods it developed for the PACE program were trade secrets, and that Norton and NPA have misappropriated and will again misappropriate them. First Health argues that Norton

learned First Health's trade secrets through his employment with First Health and involvement with the PACE program, that he misappropriated the trade secrets by disclosing them to a competitor, NPA, and by using them in his work preparing NPA's 1999 bid for the PACE program. First Health further claims that NPA knew or should have known that the information given them by Norton included trade secrets, and that it too is liable for misappropriation.

The misappropriation claims are based on the Illinois Trade Secrets Act,[4] 765 ILCS §§ 1065/1–1065/8 ("ITSA"), which provides that a court may enjoin the "actual or threatened misappropriation" of a trade secret. 765 ILCS § 1065/3(a). Accordingly, to obtain relief under the ITSA a party must show the existence of a trade secret and actual or threatened misappropriation. *See PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1269–70 (7th Cir.1995).

### a. Trade Secret—Definition

Under the ITSA, a trade secret is information including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers that:

i. is sufficiently secret to derive economic value, actual or potential, from not generally being known to other persons who can obtain economic value from its disclosure or use; and

ii. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS § 1065/2(d).

■ The focus of the ITSA "is on the secrecy of the information sought to be protected." *Service Centers of Chicago, Inc. v. Minogue,* 180 Ill.App.3d 447, 129 Ill.Dec. 367, 535 N.E.2d 1132, 1136 (1989). The significant factors in determining whether a trade secret exists under the ITSA are:

(1) The extent to which the information is known outside of the plaintiff's business,

(2) the extent to which it is known by the employees and others involved in plaintiff's business,

(3) the extent of measures taken by the plaintiff to guard the secrecy of the information,

(4) the value of the information to the plaintiff and to the plaintiff's competitors,

(5) the amount of effort and money expended by the plaintiff in developing the information,

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Strata Marketing, Inc. v. Murphy,* 317 Ill.App.3d 1054, 251 Ill.Dec. 595, 740

---

4. As discussed above, this Court is applying Illinois law to First Health's trade secret claims against Norton, and Pennsylvania law to the claims against NPA. This Court notes, however, that there is no conflict between the trade secret analysis laws of Illinois and Pennsylvania as applied to this case. In both states, the definitions of trade secret and misappropriation thereof are derived from the same source—Restatement (First) of Torts, § 757 (1939). *Christopher M's Hand Poured Fudge, Inc. v. Hennon,* 699 A.2d 1272, 1274–

75 (1997) (noting that the Pennsylvania Supreme Court has adopted the definition of "trade secret" that is set forth in comment b to Section 757 of the Restatement of Torts ("A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and gives him an opportunity to obtain an advantage over competitors who do not know or use it."), and citing *Felmlee v. Lockett,* 466 Pa. 1, 351 A.2d 273, 277 (1976)).

N.E.2d 1166, 1168 (2000). *See also Tyson Metal Products, Inc. v. McCann*, 376 Pa.Super. 461, 546 A.2d 119, 121 (1988) (citing *International Election Systems Corp. v. Shoup*, 452 F.Supp. .684, 706 (E.D.Pa.1978), and Restatement (First) of Torts § 757 cmt. b (1939)). Accordingly, "[t]hat which is of general knowledge within an industry cannot be a trade secret; something which is fully and completely disclosed by a business through its catalogues or literature disseminated throughout an industry cannot be a trade secret." *ILG Industries, Inc. v. Scott*, 49 Ill.2d 88, 273 N.E.2d 393, 396 (1971).

### b. Misappropriation—Definition

Once a plaintiff establishes a trade secret, he must next show that the defendant misappropriated it. *See* 765 ILCS § 1065/2(b).[5] Misappropriation under the ITSA is defined as:

(1) acquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret by a person without express or implied consent by another person who:

(a) used improper means to acquire knowledge of the trade secret; or

(b) at the time of the disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(i) derived from or through a person who utilized improper means to acquire it;

(ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(c) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

765 ILCS § 1065/2(b). " 'Improper Means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2(a).

### c. First Health's Trade Secret Claims Against Norton

First Health makes two trade secret claims. First, it claims that each and every listed element of its bidding and management of the PACE program is an individual trade secret. Second, it argues that, in combination, the elements were a single trade secret. The list of elements is as follows: (1) First Health's use of Paragon; (2) First Health's use of Kodak; (3) First Health's switch vendors; (4) First Health's use of PC–SAS; (5) First Health's surveillance utilization review system (SURS); (6) First Health's disaster recovery and back-up system; (7) First Health's manufacturers' rebate administration; (8) First Health's use of on-line

**5.** For applicable Pennsylvania precedent, see *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200, 204–05 (1976) (holding that "[t]he standard for determining whether one is liable for the use or disclosure of another's trade secret is set forth in the Restatement [ (First) ] Torts, § 757 (1939) and in *Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, 774, n. 3 (1965). Section 757 states: 'One who discloses or uses another's trade secret, without privilege to do so, is liable to the other if (a) he discovered the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him ....' ").

weekly status reports; (9) First Health's approach to provider training; (10) First Health's integration of imaging documentation and procedures with the cardholder services procedures manual; (11) The use of electronic providers' remittance advices and the software and processes used in the preparation of remittance advices; (12) PDA's preference that the imaging system be addressed in the takeover work plan; (13) First Health's pricing strategy for takeover; (14) First Health's pricing strategy for turnover; (15) First Health's costs and margins for the total bid price; (16) First Health's use of certain incentives to take over an incumbent contractor's personnel; (17) First Health's calculation of a labor overhead rate; and (18) First Health's PACE employee salary structure. The Court first turns to a discussion of each individual element claimed by First Health as a misappropriated trade secret.

### i. Individual Elements

### (1) First Health's use of Paragon

First Health claims that its use of Paragon software and support is a trade secret misappropriated by Norton and NPA. There is neither secrecy nor real economic value in the knowledge of First Health's relationship with Paragon. There was no confidentiality agreement between First Health and Paragon to guard the alleged secrecy of the relationship between the two, a reasonable effort which First Health could have made to protect the secrecy of the relationship. Paragon and its employees were free to disclose its business relationship with First Health, and indeed, Paragon lists First Health as a customer on its web site. Further, First Health's use of Paragon was of little economic value. Inclusion of Paragon in the bid played a small and unimportant role in PDA's evaluation of the bids. Thus, First Health is unlikely to prevail in its claim that its

use of Paragon is a trade secret misappropriated by Norton and NPA. *See Applied Industrial Materials Corp. v. Brantjes*, 891 F.Supp. 432, 438 (N.D.Ill.1994) (holding that ITSA does not protect the price employer paid supplier or charged to customer because supplier and customer were free to disclose prices of their contracts with employer). *See also SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1257 (3d Cir.1985) (holding that district court erred in holding that knowledge of third party suppliers used by plaintiff company and their prices was trade secret).

### (2) First Health's use of Kodak

First Health asserts that its use of Kodak is a trade secret misappropriated by Norton and NPA. As with First Health's use of Paragon, First Health's relationship with Kodak was not sufficiently secret to derive economic value. There was no confidentiality agreement - guarding the alleged secrecy of the relationship between First Health and Kodak. Kodak, or any of its employees, was free to disclose its business relationship with First Health. Because it was not a secret that First Health used Kodak, knowledge of the relationship was not of value to First Health's competitors. Therefore, First Health is unlikely to prevail in its claim that its use of Kodak is a trade secret. *See Applied Industrial Materials*, 891 F.Supp. 432. *See also SI Handling Systems*, 753 F.2d 1244.

### (3) First Health's switch vendors

There was no confidentiality agreement guarding the alleged secrecy of the relationship between First Health and its switch vendors NDC, Envoy and QSI. NDC, Envoy and QSI, and their employees, were free to disclose their business relationships with First Health. Because NDC, Envoy and QSI are generally known in the business and are the three major switch vendors used by most in the industry, including NPA, their use by First

Health is not sufficiently secret to derive economic value from not being generally known. *See Applied Industrial Materials,* 891 F.Supp. 432. *See also SI Handling Systems,* 753 F.2d 1244.

### (4) First Health's use of PC–SAS

First Health avers that its use of PC–SAS is a trade secret. SAS is specifically mentioned in the RFP to which NPA was responding. PC–SAS is a well known, commercially available product commonly used for the purpose of performing statistical analysis. The knowledge that First Health used PC–SAS was not valuable to NPA in preparing its bid. Because the 1999 RFP specifically designated SAS as the preferred system, it would be obvious to a competent bidder that such a system should be used for statistical analysis in managing the PACE program, and PC–SAS, an off-the-shelf product, is an obvious choice. The fact that First Health used PC–SAS was of little value, and First Health is unlikely to prevail in its claim that its use of PC–SAS was a trade secret.

### (5) First Health's surveillance utilization review system (SURS)

First Health claims that SURS, its enhanced drug utilization review system, was misappropriated. NPA did use SURS in its 1999 bid, but it was Grieger who added it to the bid, not Norton. There is no evidence that Norton disclosed or used the fact that First Health also used SURS. Therefore, without finding on the question of whether First Health's use of SURS was a trade secret, this Court finds that First Health is unlikely to succeed in showing misappropriation of that information.

### (6) First Health's disaster recovery and back-up system

First Health also claims that Norton and NPA misappropriated its trade secret disaster recovery and back-up systems. However, First Health has failed to show any improper disclosure or use of its information. NPA employee Mark Perry, not Norton, authored the section of NPA's bid proposal that included disaster recovery and back-up systems. NPA did most of its work on the 1999 bid during the period between the October draft and final submission. The fact that NPA expanded and improved its disaster and back-up plan in that time, alone, does not prove misappropriation. First Health has not offered sufficient evidence that Norton revealed any confidential First Health information concerning its disaster recovery and back-up systems to show misappropriation. Without deciding whether First Health's disaster and recovery system was a trade secret, this Court finds that First Health is unlikely to succeed in showing misappropriation.

### (7) First Health's manufacturers' rebate administration

█ First Health asserts that the way it administers the manufacturers' rebate program between two departments is a trade secret. In its bid, NPA divided the rebate administration functions between departments in a fashion similar to that of First Health. However, that decision resulted from Norton's exercise of good judgment and management skill, not in the knowledge that First Health managed rebates in that way. Former employees are entitled to use the general skills they learn during their employment in future employment, and "an employee may derive some benefit from his access to the collective experience of his [former] employer's business." *Service Centers of Chicago, Inc. v. Minogue,* 180 Ill.App.3d 447, 129 Ill.Dec. 367, 535 N.E.2d 1132, 1137 (1989). A finding that an assignment of administrative functions represents a trade secret would prevent Norton from exercising his best business judgment and effectively impose on him a

covenant not to compete. For these reasons, the Court finds that the administrative method First Health employed for the manufactures' rebate program is not a trade secret.

### (8) First Health's use of on-line weekly status reports

First Health claims that the fact that it uses on-line weekly status reports is a trade secret. However, the RFP to which NPA was responding showed a clear preference for such reports. The PDA, as well as clients in many other industries, preferred its program be managed in a way that took advantage of the increased possibilities afforded by such advances in technology. In fact, NPA had begun exploring the use of on-line weekly reports before hiring Norton. The use of on-line weekly reports is a matter of general knowledge in the industry and, as such, is not sufficiently secretive to derive economic value from not being generally known. "That which is of general knowledge within an industry cannot be a trade secret ...." *ILG Industries, Inc. v. Scott*, 49 Ill.2d 88, 273 N.E.2d 393, 396 (1971). Therefore, First Health is unlikely to succeed on this claim.

### (9) First Health's approach to provider training

First Health avers that its approach to provider training was a trade secret. The particular elements of the provider training in question—including meeting with the PDA to determine new initiatives, working with the PDA and the pharmacy association to determine whether continuing education credits may be given to attending pharmacists, and initiating contacts with hotels and Commonwealth agencies to arrange for meeting places—are elements derived from Norton's general knowledge, skill and experience, not from specific First Health knowledge pro-

tectable as a trade secret. *See Service Centers of Chicago*, 129 Ill.Dec. 367, 535 N.E.2d at 1137. These are commonly used training practices in the efficient management of a program like PACE and are not sufficiently secret to derive economic value as not generally known. Therefore, First Health is unlikely to succeed on its claim that the training practices are secrets protected by the ITSA.

### (10) First Health's integration of imaging documentation and procedures with the cardholder services procedures manual

First Health is unlikely to prevail in its claim that its integration of image documentation and procedures with cardholder service procedures manual is sufficiently secret to derive economic value from not being generally known. First, First Health did not take reasonable measures to maintain that technique as a trade secret. Second, integration of imaging documentation and procedures with the cardholder services procedures manual was of little value in winning the bid or running the program. Third, First Health is unlikely to succeed in showing misappropriation because NPA deduced that the imaging documentation and procedures should be integrated with the cardholder services procedures manual from the RFP, not from Norton. Therefore, First Health is unlikely to succeed on this claim.

### (11) The use of electronic providers' remittance advices and the software and processes used in the preparation of remittance advices

It is unlikely that First Health will prevail in its claim that its provision of electronic remittance notices for providers is sufficiently secret to be a trade secret. PACE Providers that now use this method of receiving their remittence notices from First Health are free to disclose that fact to anyone, including NPA and other com-

petitors of First Health. *See Applied Industrial Materials,* 891 F.Supp. at 438. Also, the "Provider Relations Activities" section of the RFP specifically refers to weekly remittence advices transmitted electronically. Any bid writer with Norton's general skill and knowledge would know to include the use of such advices without the specific knowledge that First Health did so as well.

The use of such remittence notices is well known in the industry. NPA itself has used electronic remittances for over a decade. Because it is general knowledge in the industry, trade secret protection will not attach. *See ILG Industries,* 273 N.E.2d at 396. Once the decision to use electronic providers' remittance advices was made, the need for software and processes to carry it out followed, and was certainly not a trade secret. For all these reasons, First Health is unlikely to succeed on this claim.

### (12) PDA's preference that the imaging system be addressed in the takeover work plan

First Health claims that its knowledge that the PDA preferred that the imaging system be addressed in the takeover work plan is a trade secret. There is no evidence that the PDA and First Health signed a confidentiality agreement which prevents the PDA from more fully articulating its preferences to First Health's competitors. PDA was therefore free to disclose such preferences. Knowledge of the preferences of one prominent customer is not the sort of market research that qualifies as a trade secret. *See SI Handling Systems,* 753 F.2d at 1259. To find that the PDA's secret preferences to be a trade secret of First Health would limit the PDA's ability to better communicate those preferences in future RFPs, and would be an artificial constraint on the free

market. *See id.* Therefore, First Health is unlikely to succeed on this claim.

### (13) First Health's pricing strategy for takeover

First Health alleges that its takeover pricing strategy is a trade secret learned by Norton when he was involved in First Health's bid to take over New York's EPIC program. First Health claims that it's pricing strategy was used by Norton and NPA to compute NPA's 1999 bid to take over the PACE program. However, this Court finds that Norton calculated NPA's takeover price without using or referencing First Health's New York EPIC bid takeover pricing. Therefore, without finding on the issue of whether First Health's takeover pricing strategy is a trade secret, the Court finds that First Health is unlikely to succeed in showing misappropriation of First Health's takeover pricing strategy.

### (14) First Health's pricing strategy for turnover

First Health claims that its strategy of bidding zero dollars for turnover is a trade secret misappropriated by Norton and NPA. The practice of bidding zero for turnover was not, however, sufficiently secret for it to be a trade secret. First Health bid zero dollars for turnover in its bid for the 1995 contract and the cost proposal for that bid. This bid was both available to and viewed by Grieger and other NPA employees. This is distinguishable from the situation where information is available on a limited basis but not viewed by the defendant in a trade secret case. In this case, the alleged trade secret was both available and actually viewed by individuals who reviewed it for precisely that sort of information and participated in the preparation of NPA's bid proposal. As such, it was not sufficiently secret to derive economic value from not being generally known and is therefore not

a trade secret. *See ILG Industries,* 273 N.E.2d at 396. Therefore, First Health is unlikely to prevail on this claim.

### (15) First Health's Costs and Margins for the Total Bid Price

First Health contends that Norton disclosed to NPA First Health's cost and margin information, which First Health claims as a trade secret. However, the facts found by this Court show otherwise. Nicoletos calculated NPA's overall bid price by anticipating First Health's total bid for the 1999 contract and bidding ten percent less. To anticipate what First Health was likely to bid, Nicoletos began with First Health's cost proposals for the 1998–2000 extension, averaged a per-year price, and adjusted for inflation. He used the resulting figure as his estimate of First Health's likely bid price for 1999. In order to bid competitively, Nicoletos estimated the amount of profit First Health would probably build into that price, and reduced his estimate of First Health's bid by that amount. He chose ten percent chiefly because that was First Health's profit margin in their 1995–1998 period. There is no evidence that Norton disclosed or used any confidential cost or margin information of First Health. Therefore, without finding on the question of whether First Health's cost or margin information is a trade secret, this Court finds that First Health is unlikely to succeed in showing misappropriation of that information.

### (16) First Health's use of certain incentives to take over an incumbent contractor's personnel

First Health asserts that the use of certain incentives to take over an incumbent's personnel is a trade secret misappropriated by defendants. The incentives at issue—allowing the staff to join NPA before their end date with First Health, retaining their anniversary dates, and offering financial incentives—are commonly known in the industry, indeed, in many industries, as methods of hiring and retaining staff through changes in ownership and management. They are also the sort of general skills and management techniques which Norton was allowed to take with him from position to position, even though he learned those skills and management techniques while in the employ of First Health. *See Service Centers of Chicago,* 129 Ill. Dec. 367, 535 N.E.2d at 1137. Therefore, First Health is unlikely to prevail in its claim that the use of certain incentives to hire and retain First Health's PACE staff is a trade secret.

### (17) First Health's calculation of a labor overhead rate

First Health claims that its labor overhead rates are a trade secret which Norton disclosed to NPA and used in the calculation of NPA's labor overhead rate. However, NPA calculated its labor overheard rate by adapting that of another of its Pennsylvania companies, not by any reference to First Health's labor overhead rates. In fact, there is no credible evidence that Norton disclosed First Health's labor rates to NPA or anyone else. The Court need not address the issue of whether First Health's calculation of labor overhead rate is a trade secret, as this Court finds that First Health is unlikely to prevail in its claim that Defendants misappropriated its labor overhead rate.

### (18) First Health's PACE employee salary structure

In its 1999 bid proposal, NPA included a statement which compared its salary structure favorably with that of First Health. NPA could not make such a comparison without knowing First Health's salary structure. Contrary to NPA's statements, NPA could not have learned First Health's salary structure from First Health's previous bid or the 1999 RFP. Norton, who

learned First Health's salary structure while in their employ, gave NPA sufficient information about First Health's salary structure for NPA to compare its salary structure favorably with that of First Health. Whether Norton disclosed everything he knew about First Health's salary structure to NPA, or merely disclosed that First Health's salary structure was the same or lower than NPA's, is of no consequence. The fact is that Norton disclosed enough of the trade secret for NPA to use it to strengthen its bid. Norton's disclosure was a breach of a confidential relationship, and as such, was improper.

First Health took reasonable measures to maintain the secrecy of its staff salary structure, namely, limiting the number of employees with access to the information, requiring employees with knowledge to sign confidentiality agreements, and keeping the information secure. The information was valuable in convincing the PDA that NPA could successfully retain First Health's staff, and therefore manage the program successfully, and do so within its budget. That gave NPA a competitive advantage over First Health and other bidders. Therefore, First Health will likely prevail in establishing that its staff salary structure was a trade secret misappropriated by Norton.

### ii. Combination of Elements

■ For six[6] of the eighteen elements claimed by First Health to be individual trade secrets, NPA obtained the information to complete those sections of their bid proposal from sources other than Norton or First Health. They were therefore not misappropriated by NPA. Because First Health was not the source of those six elements, they are excluded from the following discussion of First Health's trade secret in the combination of bidding and management elements. This Court need not decide whether the six unused elements are a part of the bid method trade secret.

Of the remaining twelve components, only First Health's staff salary structure qualifies as a trade secret sufficient to derive economic value as not generally known. However, the remaining eleven components, while not individually trade secrets, may qualify for trade secret protection as a combination not generally known.

"A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in a unique combination, affords a competitive advantage and is a protectable secret." *Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 684 (7th Cir.1983) (internal quotation omitted). *See Rohm and Haas Co. v. Adco Chemical Co.,* 689 F.2d 424, 433 (3d Cir. 1982) (holding that Pennsylvania law provides that even though each and every element of a process is known to an industry, the combination of them may be a trade secret if it "produces a product superior to that of competitors."). *See also Computer Care v. Service Systems Enters., Inc.,* 982 F.2d 1063, 1074 (7th Cir. 1992); *Hexacomb Corp. v. GTW Enters., Inc.,* 875 F.Supp. 457, 463 (N.D.Ill.1993). A combination of a business's information, including information on suppliers, sales, employee history, gross profits, revenues,

---

**6.** The following six originated with, or were calculated by reference to, something or someone other than Norton or First Health: Number 5, the SURS; Number 6, the disaster recovery and back-up systems; Number 10, the integration of image documentation with cardholder services manual; Number 13, the takeover pricing strategy; Number 15, the costs and margins for the total bid price; and Number 17, the calculation of labor overhead.

expenses, financing agreements, investor lists, marketing plans, and special customer relationships are sufficient to state an ITSA claim. *MJ & Partners Rest. Ltd. P'ship v. Zadikoff,* 10 F.Supp.2d 922, 932 (N.D.Ill.1998).

Trade secrets which are composed of a compilation or combination of elements must pass the same "sufficiently secret" test as trade secrets composed of individual pieces of information. *George S. May Int'l Co. v. International Profit Assocs.,* 256 Ill.App.3d 779, 195 Ill.Dec. 183, 628 N.E.2d 647, 653 (1993) (holding that firm's business evaluation methods were not sufficiently secret to be protected by ITSA because the information was disseminated to thousands of trainees before they signed confidentiality agreements, the manuals were not kept confidential, and the plaintiff never identified the exact information it claimed to be a trade secret).

In this case, the factors used to determine whether trade secret status exists weigh in favor of trade secret status for First Health's method of bidding for PACE. 765 ILCS § 1065/2(d), *Strata Marketing, Inc. v. Murphy,* 317 Ill.App.3d 1054, 251 Ill.Dec. 595, 740 N.E.2d 1166, 1168 (2000). Individually, the eleven key features of the First Health bid were not sufficiently secret to be trade secrets. However, First Health combined them into a unique method or formula of bidding for and managing the PACE program. That method is itself sufficiently secret such that First Health derived economic value from its not being generally known. 765 ILCS §§ 1065/1–1065/8. As acknowledged by Snedden, the PDA does not own the unique way in which First Health tied together these elements into a unique method of bidding for managing the PACE program.

First Health invested a great deal of time and money in developing its bid method over the years it managed the program. Some of that investment consisted of employing Norton to develop a successful, and secret, method of bidding for and managing PACE. It would have been difficult and time-consuming for NPA or another of First Health's competitors to develop properly its own successful bidding method. By hiring Norton and using First Health's bidding method, NPA avoided making the investment necessary to develop its own competitive method. Indeed, Norton could have worked for NPA to develop its own PACE bid method without using First Health's method, but he did not. NPA could have developed its own competitive method with the knowledge and skill of Norton, and not used First Health's method, but it chose instead to use First Health's method.[7]

For First Health's competitors, including NPA, knowledge of First Health's bidding method was very valuable. None of First Health's competitors had succeeded in winning the valuable PACE contract despite several years of trying. First Health's bidding method was not known, either outside of First Health or to First Health employees not directly involved with the bidding method. Norton knew how to make NPA's bid to manage the PACE program look almost identical to that of First Health, and how to manipulate that method to shave off a little here and there with the expectation of underbidding First Health. While Norton did not know how much First Health would bid for the entire PACE contract, his knowledge of its entire process allowed him to prepare a bid that looked like First Health's while underbidding First Health.

---

7. *See* § III.C.1.d, *infra.*

First Health undertook reasonable efforts to maintain the secrecy of its combination. First Health strictly limited the number of employees with access to the information and required that they sign confidentiality agreements. First Health kept the information in a locked room and password-protected computers. These measures more than meet the requirement that "efforts ... are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS § 1065/2(d).

Weighing against trade secret status is the limited availability of First Health's old PACE bids, which contained some of the elements still used in the 1999 bids. Key elements that Norton used in developing NPA's 1999 bid, such as the elements making use of technological advances in information sharing, storage and use, were not contained in First Health's old bids. The availability of old bids does not tip the balance against all the other factors of trade secret analysis. Careful analysis of all the facts shows that First Health's method of bidding to manage PACE was sufficiently secret to derive economic value from not being generally known. Therefore, First Health is likely to succeed in showing that its unique bidding method was a trade secret as defined by ITSA.

This Court has found no opinions applying ITSA to the question of whether a bid method can constitute a trade secret. However, a number of courts have found bidding methods to be trade secrets under the laws of other states. In *Air Products and Chemicals, Inc. v. Johnson,* 296 Pa.Super. 405, 442 A.2d 1114 (1982), the court upheld the trial court's finding that, amongst other information, the plaintiff company's bidding procedures was a trade secret because it gave them an advantage with its customers. The court in that case reasoned that, where developing bids for large projects takes a great deal of time and effort, and a competitor's costs and pricing methods are of a great deal of interest and benefit in intensely competitive bidding, trade secret protection should attach. *Id.* at 1120–1122. In the case at bar, First Health developed its bidding method over a long period of time at great expense. As with *Air Products,* the project under bid is large and the bidding intensely competitive. First Health paid employees such as Norton to develop its methods and pricing methods which were, together, valuable to First Health, and its competitors, because it was not generally known. *See Pennfield Precision, Inc. v. EF Precision, Inc.,* No. CIV.A.00–280, 2000 WL 1201381 (E.D.Pa. Aug.15, 2000) (finding, under Pennsylvania's trade secret law similar to the ITSA, that bids involving non-secret pricing data and knowledge of the former employer's technical abilities to which the former employer "added a nuance worthy of trade secret protection" were trade secrets); *American Totalisator Co., Inc. v. Autotote Ltd.,* No. CIV.A.7268, 1983 WL 21374 at *3–4 (Del.Ch. Aug.18, 1983) (finding, under a Delaware trade secret statute similar to the ITSA, that the defendant's method of bidding was a trade secret because it was "studded with the very particular knowledge of [plaintiff] company's cost factors and how they could be manipulated for varying the margin of profit" and "necessarily encompasse[d] a philosophy for future operation and, as such, possesses some proprietary value to [plaintiff] and a devastating advantage if it becomes available to its competitors"). *See also Triangle Sheet Metal Works, Inc. v. Silver,* 154 Conn. 116, 222 A.2d 220, 225 (1966) (upholding preliminary injunction where plaintiff's costs, pricing and bidding procedures were trade secret); *Stewart & Stevenson Services, Inc. v. Serv–Tech, Inc.,* 879 S.W.2d 89, 105–07 (Tex.App.1994) (finding bidding system to be a trade secret); *Support Systems Associates, Inc. v.*

*Tavolacci,* 135 A.D.2d 704, 522 N.Y.S.2d 604, 606 (N.Y.App.Div.1987) (finding that bid proposal, including management approach, recruiting plan, quality control and numbers of units, was highly confidential and, if known to competitors they would be able to underbid plaintiff, therefore bids were entitled to trade secret protection). *But see Coskey's Television & Radio Sales & Service, Inc. v. Foti,* 253 N.J.Super. 626, 602 A.2d 789, 794 (1992) (holding that, where the solicitation of bids for major products is well known, and the products available are well known, the ability to put them together into a successful bid is the sort of general skill a former employee may use although learned in his tenure with the former employer and is not a trade secret).

When he undertook to work for NPA on its PACE bid, Norton was one of those selected employees in possession of trade secret bid preparation information from his former employer, First Health. He was First Health's officer-in-charge of PACE for approximately three years. While employed at First Health, Norton actively participated in preparing bids and developed or expanded several elements of First Health's bids. Norton signed a confidentiality agreement to keep those trade secrets confidential, and he breached that agreement. Norton disclosed this combination of elements—First Health's trade secret method of bidding to manage PACE—to First Health's competitor NPA. Moreover, Norton disclosed First Health's trade secret knowing that NPA would use it in its bid. NPA, at Norton's recommendation, used the bid related trade secret elements in its bid. Norton wrote sections of NPA's bid proposal which included elements of the trade secret method and

"touched" every page of NPA's bid as one of NPA's "red team" of bid reviewers. Thus, First Health is likely to succeed in its claim that Norton misappropriated First Health's trade secret bidding method.

### d. First Health's Trade Secret Claims Against NPA [8]

 First Health claims that NPA misappropriated First Health's trade secrets when it improperly acquired from Norton what NPA knew or had reason to know were trade secrets and used them in NPA's bid. As discussed above in §§ III.C.1.c.ii and III.C.1.d.i(17), First Health's unique method of bidding to manage PACE and First Health's staff salary structure were trade secrets disclosed to NPA by Norton. NPA, in turn, used those trade secrets in its bid. NPA is liable for misappropriation if NPA used improper means to acquire them. Restatement (First) Torts, § 757 (1939).

NPA hired Norton as a consultant for the sole purpose of working on its PACE bid and paid him fifteen thousand dollars for the three weeks he worked on the bid. NPA knew that Norton had held high positions within First Health and had worked extensively on all facets of past First Health PACE bids, and that Norton was in possession of information confidential to First Health. NPA knew of the Confidentiality Agreement between Norton and First Health which prohibited Norton from disclosing First Health's trade secrets. While Norton told NPA during his oral interview that, if hired to work on the bid proposal, he would not disclose any of First Health's confidential information, NPA had reason to know that once hired he did so disclose.

---

8. As discussed above, this Court will apply Pennsylvania law to this claim. Pennsylvania courts have adopted the approach in Restatement (First) of Torts § 757 cmt. b (1939). The parallel Illinois statute is found at 765 ILCS § 1065/2(b)(2)(b)(ii).

NPA should have known, because of its knowledge of the industry and previous PACE bids, that Norton's contributions to its bid proposal included First Health's trade secrets. There is no evidence that NPA reviewed the information Norton was providing to check that he was not disclosing trade secrets, even though it knew he possessed secret information that would be of value to NPA's bid. Nor is there evidence that NPA made any efforts to prevent him from using First Health's trade secrets. NPA may not hide improper acquisition of trade secrets behind a veil of willful ignorance. This Court finds that NPA improperly used First Health's trade secret bid method, which NPA had reason to know, and should have known, that Norton was improperly disclosing to them, and which he had a duty to keep confidential. Therefore, First Health will likely prevail on the merits of in its claim that NPA misappropriated its trade secret bid method.

### 2. First Health v. Norton—Breach of Contract

The Court now turns to First Health's breach of contract claim against Norton. First Health's claim is based on three restrictive covenants in Norton's Employment Agreement: the confidentiality provision (Agreement § 7), the restriction on customer solicitation (Agreement § 8), and the restriction on employee solicitation (Agreement § 9).

In order to succeed on its breach of contract claims, First Health must demonstrate (1) the existence of a valid and enforceable contract, (2) performance by First Health, (3) breach by Norton, and (4) resultant injury to First Health. *See Gallagher Corp. v. Russ,* 309 Ill.App.3d 192, 242 Ill.Dec. 326, 721 N.E.2d 605, 611 (1999); *Elson v. State Farm Fire & Casualty Co.,* 295 Ill.App.3d 1, 229 Ill.Dec. 334, 691 N.E.2d 807, 811 (1998). Here, the viability of First Health's claims hinges on the enforceability of the provisions at issue.

The question of whether a restrictive covenant is enforceable is a question of law. *See Woodfield Group, Inc. v. DeLisle,* 295 Ill.App.3d 935, 230 Ill.Dec. 335, 693 N.E.2d 464, 466 (1998). "A post-employment restrictive covenant will be enforced if its terms are reasonable." *Coady v. Harpo, Inc.,* 308 Ill.App.3d 153, 241 Ill.Dec. 383, 719 N.E.2d 244, 250 (1999) (quoting *Woodfield Group,* 230 Ill.Dec. 335, 693 N.E.2d at 466). "To determine the reasonableness of a restrictive covenant, 'it is necessary to consider whether enforcement of the covenant will injure the public, whether enforcement will cause undue hardship to the promisor and whether the restraint imposed by the covenant is greater than is necessary to protect the interests of the employer.'" *Id.* (quoting *Tower Oil & Technology Co., Inc. v. Buckley,* 99 Ill.App.3d 637, 54 Ill.Dec. 843, 425 N.E.2d 1060, 1065 (1981)). "Such covenants will be enforced 'only if the time limit and geographic scope are reasonable, trade secrets or confidential information are involved, and the restriction is reasonably necessary for the protection of a legitimate business interest.'" *MBL (USA) Corp. v. Diekman,* 112 Ill.App.3d 229, 67 Ill.Dec. 938, 445 N.E.2d 418, 425 (1983) (citing *Image Supplies, Inc. v. Hilmert,* 71 Ill.App.3d 710, 28 Ill.Dec. 86, 390 N.E.2d 68, 70 (1979)).

Before deciding whether a restriction is reasonable, "the court must make a threshold determination: it must find 1) that the covenant is ancillary to a valid employment contract and 2) that it is supported by adequate consideration." *Applied Micro, Inc. v. SJI Fulfillment, Inc.,* 941 F.Supp. 750, 753 (N.D.Ill.1996) (enforcing non-competition covenant and citing

*Abel v. Fox,* 274 Ill.App.3d 811, 211 Ill.Dec. 129, 654 N.E.2d 591, 593 (1995) and *Creative Entertainment, Inc. v. Lorenz,* 265 Ill.App.3d 343, 202 Ill.Dec. 571, 638 N.E.2d 217, 219 (1994)).

### a. Confidentiality Restriction

The Agreement provides that Norton will not "directly or indirectly use or disclose, for the benefit of any person, firm or entity other than [First Health] and its subsidiary companies, the Confidential Business Information of [First Health]." Agreement § 7. The Agreement continues, defining "Confidential Business Information" as

> information or material which is not generally available to or used by others or the utility or value of which is not generally known or recognized as a standard practice, whether or not the underlying details are in the public domain, including but not limited to its computerized and manual systems, procedures, reports, client lists, review criteria and methods, financial methods and practice, plans, pricing and marketing techniques as well as information regarding [First Health's] past, present, and prospective clients and their particular needs and requirements, and their own confidential information.

*Id.* Under Illinois law, it is not enough that Norton violated the terms of the Agreement on its face. First, the Court must determine whether the terms of the agreement are reasonable, and therefore enforceable. *See Coady,* 241 Ill.Dec. 383, 719 N.E.2d at 250.

Norton and First Health executed the Employment Agreement on October 1, 1997. In return for executing the Agreement, Norton received valuable consideration, including stock options. Thus, the confidentiality restriction is ancillary to a valid employment contract and that it is supported by adequate consideration.

Next, the Court must determine whether the restriction is reasonable. In making such a determination, the Court considers the factors noted above. Illinois courts have generally found the public interest to be served by enforcement of restrictive covenants where the restriction is auxiliary to the main purpose of the contract, and is "necessary to protect one party from injury by the unfair use of the subject-matter of the contract by the other party." *Union Trust & Sav. Bank of East St. Louis v. Kinloch Long–Distance Tel. Co. of Missouri,* 258 Ill. 202, 101 N.E. 535, 537 (1913). *See also Applied Micro,* 941 F.Supp. at 756–57 (discussing Illinois law). However, this must be balanced with Norton's fundamental right to pursue employment in his area of expertise. *See Disher v. Fulgoni,* 124 Ill.App.3d 257, 79 Ill.Dec. 735, 464 N.E.2d 639 (1984). *See also George S. May Int'l Co. v. International Profit Assocs.,* 256 Ill.App.3d 779, 195 Ill. Dec. 183, 628 N.E.2d 647, 653 (1993) ("An individual has a fundamental right to use his general knowledge and skills to pursue the occupation for which he is best suited." (citation omitted)). Weighing these competing interests, this Court finds that Norton is fully able to pursue employment in his field while continuing to honor his non-disclosure agreement with First Health.

■ Section 7 of the Agreement, however, is overbroad in that it lacks any geographic or time limitation. Normally, confidentiality agreements lacking geographic or time limitations will be found invalid. The exception to the rule is where, as here, trade secrets and confidential information are involved. *See Coady,* 241 Ill.Dec. 383, 719 N.E.2d at 250. As this Court has found that First Health is likely to succeed in showing that Norton violated ITSA and disclosed the trade se-

cret information when assisting NPA with its 1999 PACE bid proposal, First Health is similarly likely to establish that Norton violated the confidentiality clause of his Agreement with First Health. Therefore, this Court finds it reasonable to enforce this contractual provision under these circumstances, and further finds that First Health is likely to succeed in showing that Norton violated § 7 this provision by disclosing the confidential and proprietary information of First Health.

### b. Customer Solicitation Restriction

■ Section 8 of the Agreement provides that Norton will not solicit any actual or prospective customer of First Health for a period of one year after the termination of his employment. Section 8 provides an exception to this otherwise clear rule:

> For the purposes of this Section, responding to an unsolicited request for proposal by a customer or prospective customer which is a government agency or government contractor will not constitute a violation of [Norton's] obligation hereunder.

Agreement § 8.

As noted above, the Court must make a threshold determination that the restriction is ancillary to a valid employment contract and that it is supported by adequate consideration. Again, the Court finds that it is. Further, this Court finds that the restriction contained within this section is reasonable. The public interest favors the enforcement of contracts, and this provision does not subject Norton to undue hardship. Finally, the time limitation of one year from the termination of Norton's employment provides a discrete

boundary to the restriction, and is thus reasonable.

■ At issue is the meaning of the language contained within in the contract. First Health urges this Court to find that "as intended by the parties, the purpose of Section 8 is (i) to allow Norton to assist a new employer to respond to an *unsolicited* RFP from a government agency, but (ii) to *preclude* Norton from calling upon, soliciting or diverting *directly or indirectly,* First Health's actual and prospective customers." Memo. of Law of Pl. at 24 (emphasis in original). However, this simply is not what the Agreement says. The Agreement provides a clear exception to the customer nonsolicitation rule. Norton may, as he did, work on an RFP for an organization, NPA, that received an unsolicited RFP from the PDA.

Moreover, even in the absence of this broad exception to the contract's prohibitions, under Illinois law, the customer non-solicitation provision would not be enforceable. In order for a post-employment restrictive covenant to be enforceable, there must first be a protectable interest. *McRand, Inc. v. Van Beelen,* 138 Ill. App.3d 1045, 93 Ill.Dec. 471, 486 N.E.2d 1306, 1311 (1985). Illinois courts apply a two-part test in cases involving customer non-solicitation agreements. First, the employer must have a near-permanent relationship with its customers; second, the employee would not have had the contact with the customers but for the employment. *See Midwest Television, Inc. v. Oloffson,* 298 Ill.App.3d 548, 232 Ill.Dec. 783, 699 N.E.2d 230, 233 (1998). Illinois courts look at many factors when determining whether a customer relationship is near-permanent.[9] However, all the cases

---

9. There are seven factors Illinois courts consider when determining whether a near-permanent employment relationship existed:

(1) the number of years the employer needs to develop its clientele; (2) the money invested to develop a clientele; (3) the diffi-

discussing this issue involve private-sector customers. Here, the very nature of the PACE contract with the Commonwealth of Pennsylvania, a renewable contract for which contractors bid periodically, establishes the impermanence of the relationship. Therefore, this Court finds that First Health is not likely to succeed on the merits of this claim.

### c. Employee Solicitation Restriction

■ First Health also argues that Norton has breached the employee solicitation restriction contained in § 9 of the Agreement. In the Court's threshold determination of whether the restriction is ancillary to a valid employment contract and supported by adequate consideration, the Court finds that it is. Accordingly, the Court turns to an analysis of the reasonableness of the restriction. Here, too, the Court finds this restriction to be reasonable. It is in the public interest to enforce contracts. It is not undue hardship to require Norton to refrain from hiring First Health employees. Finally, the one year limit on the restriction is sufficiently narrow to render the provision reasonable. The lack of geographic limitation for this provision is of no concern, as it applies only to the solicitation of employees of First Health, and is therefore reasonably limited. *See, e.g., Corroon & Black of Illinois, Inc. v. Magner,* 145 Ill.App.3d 151, 98 Ill.Dec. 663, 494 N.E.2d 785, 793 (1986) (finding lack of geographical limitation in restrictive covenant limited to the nonsolicitation of customers not unreasonable where company operated nationally).

culty involved in developing the clientele; (4) the extent of personal customer contact by the employee; (5) the employer's degree of knowledge of its customers; (6) the time the customers have been associated with the employer; and (7) the continuity of

■ First Health alleges that Norton solicited his friend and former colleague Howells to work for NPA in the course of a phone conversation held on February 3, 2000. However, this Court finds that this conversation was not a solicitation.

Further, First Health alleges that Norton would have been in breach of this contractual provision had NPA's plan to take over PACE and hire Norton as officer-in-charge been realized. First Health makes the case that, had Norton been NPA's officer-in-charge of the PACE program, and had NPA followed through on its plans to hire First Health's PACE employees, Norton would have breached his contractual obligations to First Health not to solicit their employees. This does establish that Norton has committed to a course of conduct that would have represented a breach of his Agreement with First Health not to solicit their employees had this litigation not interfered. However, the one year time restriction contained in § 9 has passed, and Norton has not solicited any First Health employees. Therefore, as there has been no actual breach of this contractual provision, and because the time period has elapsed there can be no future breach, First Health is not likely to succeed on the merits of this claim.

### 3. First Health v. Norton—Intentional Interference with Prospective Contractual Relationship

■ First Health also asserts an intentional interference with prospective contractual relations claim against Norton. As discussed above in § III.A, Pennsylvania law applies to these claims. Under

relationships between the employer and its customers.
*Midwest Television,* 699 N.E.2d at 233 (citing *McRand,* 93 Ill.Dec. 471, 486 N.E.2d at 1311–1312).

Pennsylvania law, a claim for the tort of intentional interference with contractual or prospective contractual relations requires the following elements: (1) a contractual or prospective contractual relation between First Health and a third party; (2) defendant's purpose or intent to harm plaintiff by preventing the relation from occurring; (3) that defendant lacks a privilege or justification; and (4) actual damages. *See Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 471 (1979); *Hess v. Gebhard & Co., Inc.,* 769 A.2d 1186, 1194 (Pa.Super.2001). *See also Remick v. Manfredy,* 238 F.3d 248, 263 (3d Cir.2001) (applying Pennsylvania law).

 First Health argues that Norton tortiously interfered with First Health's potential contractual relationship with PDA with respect to the PACE contract awarded in 1999. The first element of the tort is met here. A prospective contractual relationship is a reasonable probability of a contract, that is, "something less than a contractual right, [but] something more than a mere hope." *Thompson Coal,* 412 A.2d at 471. While far from an ironclad guarantee, First Health's track record with the PACE contract, together with the fact that it did submit a bid for the contract in 1999, provide sufficient evidence that First Health had far more than a mere hope that, once again, the contract would be awarded to First Health.

First Health's claim instead rides on the second and third elements of this tort. Pennsylvania courts have discussed these prongs as related, and have noted that the question appears to be whether a defendant has acted in "good faith." *See, e.g., Ruffing v. 84 Lumber Co.,* 410 Pa.Super. 459, 600 A.2d 545, 549 (1991). "[T]he relevant inquiry must focus on the *propriety* of a defendant's conduct considering the factual scenario as a whole." *Id.* (citing *Adler, Barish, Daniels, Levin & Creskoff*

*v. Epstein,* 482 Pa. 416, 393 A.2d 1175, 1183–84 (1978)) (emphasis in original). The Pennsylvania courts utilize the Restatement (Second) of Torts, § 767, in the analysis:

§ 767 Factors in Determining whether Interference is Improper

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contract relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes

(d) the interests sought to be advanced by the actor

(e) the social interests in protecting the freedom of the actor and the contractual interest of the other,

(f) the proximity or remoteness of the actor's conduct to there interference, and

(g) the relations between the parties.

Restatement (Second) of Torts, § 767 (1977).

In considering the second and third prongs of this tort, and all the factors that play into such an examination, this Court finds that Norton did not have a privilege to interfere with First Health's prospective contract with PDA. Norton did have the right, pursuant to the exception in Section 8 of his Agreement with First Health, to work for NPA on the PACE bid proposal. However, this Court has found that First Health is likely to prevail in its claim that Norton violated his Agreement by disclosing and using trade secret information for his and NPA's benefit during the preparation of the bid proposal. Norton's deliberate breach of his contractual obligations constitutes bad faith.

Finally, this Court finds that First Health will likely be able to establish damages associated with this claim. Therefore, the Court finds that First Health is likely to prevail in its claim for intentional interference with prospective contractual relations against Norton.

### 4. First Health v. NPA—Intentional Interference with Prospective Contractual Relations

■ First Health also asserts that NPA is liable for intentional interference with prospective contractual relations. The elements of this claim are discussed above. Normally, "[o]ne who causes loss of business ... to another merely by engaging in a business ... in good faith is not liable to the other for loss caused, though he knows the loss will result." *Peoples Mortgage Co. Inc. v. Federal Nat'l Mortgage Ass'n,* 856 F.Supp. 910, 933 (E.D.Pa.1994) (quoting Harper, James and Gray, *The Law of Torts* § 6.13 at 354 (2d ed.1986)). The issue here, then, is whether NPA operated in "good faith." NPA, as a contractor who had in the past bid on the PACE program and was asked by PDA to submit a bid in 1999, had a privilege to bid on this contract. NPA intended to and would have submitted a bid proposal, with or without Norton's contributions. While First Health could hope to win the contract yet again, the very nature of a state contract is that it is temporary, for a set time, and renewable only if the contractor wins the contract. While NPA did have a general privilege to submit a bid for the PACE contract, NPA did not have a privilege to submit the bid it did—one replete with misappropriated trade secret information. By submitting this bid, NPA act-

ed in bad faith. Therefore, First Health is likely to succeed on the merits of this claim against NPA.

### 5. First Health v. NPA—Intentional Interference with Contractual Relations

■ First Health asserts a claim for intentional interference with contractual relations against NPA, arguing that NPA intentionally interfered with the Agreement between First Health and Norton.[10] As discussed above, the Court will apply Pennsylvania law. The elements of this tort are the same as for intentional interference with prospective contractual relationships, as is the analysis. *See, e.g., Peoples Mortgage Co.,* 856 F.Supp. at 933 (E.D.Pa.1994) ("A similar approach should be taken for analyzing claims of intentional interference with prospective contracts as is taken for claims of intentional interference with an existing contract.") (internal quotation marks and citation omitted).

As to the first element of this cause of action, it is undisputed that a contractual relationship existed between First Health and Norton, in the form of the October 1, 1997 Employment Agreement. A more detailed discussion regarding what NPA knew about the Agreement is necessary to determine whether NPA was aware of the contractual relationship between First Health and Norton, and whether NPA intentionally and without justification induced Norton to breach his contract.

#### a. *Interference with Norton's Confidentiality Agreement*

It is undisputed that NPA knew that Norton had an Employment Agreement

---

**10.** First Health also appears to brief the issue of corporate raiding, a separately cognizable claim, in its memorandum of law in support of the motion for a preliminary injunction. However, First Health has not set forth a count for corporate raiding against NPA in

the complaint. This Court will not award a preliminary injunction on grounds not raised in the complaint, as there is, by virtue of the absence of the issue from the complaint, no likelihood of success on the merits.

with First Health which included a confidentiality agreement, found in § 7 of the Agreement, that prohibits Norton from disclosing First Health's confidential business information, including its trade secrets. In fact, Norton gave NPA a copy of § 7 of the Agreement during his oral interview before NPA hired him. During the same interview, Norton told NPA that he would not divulge First Health's confidential information. It is clear then that NPA knew about this provision. Far from dissuading Norton from breaching his contract, NPA, knowing that Norton was likely using and including First Health confidential and trade secret information when preparing NPA's bid, benefitted from the misappropriation. NPA had no privilege to do so. First Health is likely to succeed in establishing both that Norton breached this provision of his Agreement, and that First Health suffered damages therefrom. Therefore, with respect to § 7 of the Agreement, First Health is likely to succeed on the merits of its tortious interference with contractual relations claim against NPA.

b. *Interference with Norton's Customer Non–Solicitation Agreement*

It is undisputed that Norton gave NPA a copy of the customer non-solicitation agreement, found at Section 8 of the Agreement, during his oral interview before being hired by NPA. Since this Court has found that First Health is not likely to succeed on the merits of its breach of contract claim against Norton with respect to this particular paragraph, so too is First Health unlikely to succeed in establishing that NPA tortiously interfered with Norton's performance of this provision.

c. *Interference with Norton's Employee Non–Solicitation Agreement*

Finally, it is undisputed that Norton did not give NPA a copy of the employee non-solicitation agreement during his interview. In fact, when he gave NPA the confidentiality and customer non-solicitation sections of his contract with First Health, he represented to them that those two were the only limitations on his future employment. There is no evidence that NPA knew that Norton was under an employee non-solicitation restriction. While there is some evidence that NPA should have suspected that there were contractual limits on Norton's ability to hire First Health employees, since NPA requires its own employees to sign such a contract, this is not sufficient evidence for this Court to find that Plaintiff is likely to succeed on the merits of this claim.

## D. Irreparable Harm

Having established that there is a reasonable probability of success on the merits as to some of its claims, First Health has cleared the first hurdle towards a preliminary injunction. The Court now turns to the issue of irreparable harm.

First Health claims that it has satisfied the requirement for demonstrating irreparable harm by virtue of Norton's Employment Agreement with First Health. The Agreement provides that, in the event that Norton breaches §§ 7, 8, or 9 of the Agreement, First Health shall be entitled to injunctive relief enjoining any actual or threatened breach, and that Norton "acknowledges that [First Health's] remedy at law is inadequate and that [First Health] will suffer irreparable injury if such conduct is not prohibited." Agreement § 10. First Health cites no authority, and this Court has found none, in support of the proposition that the parties may contractually bind themselves and the Court to injunctive relief before any breach has occurred. Because the nature of the alleged breach and its consequences

are unknown when a contract is executed, a question exists as to whether the parties can effectively waive a judicial determination on this crucial element.

"[T]he grant of injunctive relief is an extraordinary remedy ... which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988) (citing *United States v. City of Philadelphia*, 644 F.2d 187, 191 n. 1 (3d Cir.1980)). As Justice Baldwin, sitting on the Circuit Court for the District of New Jersey wrote 171 years ago, "[t]here is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing (of) an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages." *Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821 (C.C.D.N.J.1830) (No. 1,617).

In determining whether a preliminary injunction should issue, a court must first look to whether the plaintiff is likely to experience irreparable harm without an injunction, and second, to whether the plaintiff is reasonably likely to succeed on the merits. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir.2000). "A court may not grant this kind of injunctive relief without satisfying these requirements, regardless of what the equities seem to require." *Id. See also In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir.1982).

It would represent an extraordinary variance from this basic principle for a court to recognize that the parties to a suit at equity have contracted around one of these fundamental elements. "It is a basic doctrine of equity jurisprudence that courts of equity should not act ... when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) and *Younger v. Harris*, 401 U.S. 37, 43–44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)) (internal quotation marks omitted). Therefore, this Court must not interpret § 10 of Norton's Employment Agreement with First Health to waive the required analysis of whether, in fact, Plaintiff has established that it will suffer irreparable harm in the absence of a preliminary injunction.

"[T]o show irreparable harm a plaintiff must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir.1989)). Quite simply, this means that if the threatened harm is compensable with monetary damages, a plaintiff has not demonstrated irreparable harm and, therefore, is not entitled to a preliminary injunction. *See Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102–03 (3d Cir.1988). *See also Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 363 (7th Cir. 1993) (finding, in trademark case, that lost profits due to potential breach of trademark could be recouped as money damages, and therefore no irreparable harm resulted form the continued use of the trademark). Further, since the purpose of a preliminary injunction is to deter, not to punish, see *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944), any irreparable harm alleged by Plaintiff must be prospective. A preliminary injunction is not a vehicle through which a plaintiff can seek correction of past

wrongs. The Court will now analyze irreparable harm as to each of Plaintiff's claims.

### 1. First Health v. Norton and NPA— Misappropriation of Trade Secrets

■ First Health asks this Court to issue an injunction "to prevent the further disclosure and use of First Health's trade secrets that will result if Norton goes to work for NPA as its office-in-charge of the PACE program." Pl.'s Memo of Law at 30. First Health asserts that, as officer-in-charge of the PACE program, Norton will inevitably disclose, use and put at risk business information proprietary to First Health. Indeed, if Norton is unable to serve as officer-in-charge without disclosing or using First Health's trade secrets, this Court may enjoin his employment in that capacity under the doctrine of inevitable disclosure. *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1269–70 (7th Cir.1995) (affirming permanent injunction under ITSA where defendant would inevitably rely upon plaintiff's trade secrets because he could not help but use the information where, "unless [he] possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [his new employer] by relying on his knowledge of [his former employer's] trade secrets."); *Air Products and Chemicals, Inc. v. Johnson,* 296 Pa.Super. 405, 442 A.2d 1114, 1122–25 (1982) (affirming preliminary injunction against use or disclosure of trade secrets and restraining defendant, plaintiff's former employee, from working in certain of the competitor's operations for one year because "it would be impossible for the employee to perform his duties at the new employer without disclosing trade secrets.").

It is plaintiff's burden to assert what trade secrets its former employee would inevitably disclose, and why disclosure is inevitable. *PepsiCo,* 54 F.3d at 1269; *Teradyne, Inc. v. Clear Communications Corp.,* 707 F.Supp. 353, 356–57 (N.D.Ill.1989). The question this Court must answer is whether, as officer-in-charge of PACE under NPA, Norton "could not operate or function without relying on [Plaintiff's] alleged trade secrets." *Strata Marketing, Inc. v. Murphy,* 317 Ill.App.3d 1054, 251 Ill.Dec. 595, 740 N.E.2d 1166, 1179 (2000).

Once NPA's 1999 bid for the PACE contract was submitted, Norton's misappropriation of First Health's trade secret method of bidding to manage and administer PACE was complete. The bids have been submitted and the PDA may disclose them to the public under its procedures. If there are other trade secrets which Norton misappropriated during the bidding process, First Health has not shown what those are or why Norton would inevitably disclose them.

Unlike in *PepsiCo,* where the defendant possessed trade secrets which he had not yet disclosed or used and was put in a position where he would inevitably disclose them, Norton already disclosed the bid method trade secret. *Cf. PepsiCo,* 54 F.3d 1262. Once the bids were submitted it is up to the PDA to decide who gets to manage PACE and how to deal with First Health's bid protest. The fact that Norton will occupy the same position as he did at First Health, together with his past disclosure of First Health's trade secrets, does not show inevitable disclosure when there is nothing left to disclose. Injunctive relief cannot turn back the clock.

The next bidding period for PACE is several years away, and by no means sufficiently imminent for a preliminary injunction to issue to prevent Norton from working on future bids. There is no evidence that NPA plans to bid for any other prescription program, or that use of First Health's bid method is inevitable if Norton

works on them. Further, Norton no longer has access to new information about First Health's bidding plans for PACE or any other contract. Therefore, First Health cannot establish irreparable harm on this basis.

■ With regard to the staff salary structure trade secret, Norton's disclosure was of how First Health's staff salary structure compared to NPA's. There is no evidence that Norton would inevitably disclose and/or use First Health's salary structure if and when he becomes officer-in-charge of PACE. While there is a possibility that he would disclose or use it, such misappropriation is by no means inevitable. A preliminary injunction should not issue where harm is speculative. *Teradyne*, 707 F.Supp. at 356 (N.D.Ill.1989). *See also Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3rd Cir.1980). Therefore, First Health has failed to show that Norton will inevitably disclose, as officer-in-charge of PACE, any of First Health's trade secrets.

■ Further, any damages that First Health may suffer by the turnover of the PACE program from First Health to NPA management will be monetary in nature, and thus compensable at law. Money damages are appropriate to compensate for contracts lost through wrongful disclosure of trade secrets. *See, e.g., Support Systems Assocs., Inc. v. Tavolacci*, 135 A.D.2d 704, 522 N.Y.S.2d 604, 606 (N.Y.App.Div.1987) (upholding the trial court's award of money damages to compensate for lost profits on a lost contract). Such is the case here. As First Health has failed to establish inevitable disclosure, it has failed to establish irreparable harm on its trade secret claims.

## 2. First Health v. Norton—Breach of Contract

■ As with its claim for misappropriation of trade secrets, First Health must establish irreparable harm in order to be entitled to injunctive relief on its breach of contract claim against Norton. The analysis with respect to the confidentiality agreement at § 7 of the Agreement is the same as for misappropriation of trade secrets. Here, the Court has found that an injunction would not prevent further use or disclosure of confidential or trade secret information, since Norton has already disclosed all that he is likely to disclose. As this Court has found that Norton is able to work for NPA on the PACE contract without further disclosing trade secret information, he is able to do without breaching his confidentiality agreement.

Imminent irreparable harm is not established by the threatened hire of First Health employees in the event of an NPA takeover of the PACE program. The non-solicitation provision found at § 9 of the Agreement prohibits the solicitation of First Health employees for one year, and that period has long since lapsed. Therefore, First Health cannot establish irreparable harm, and no injunction can issue from this part of the Agreement. *See, e.g., Hamer Holding Group, Inc. v. Elmore*, 244 Ill.App.3d 1069, 184 Ill.Dec. 598, 613 N.E.2d 1190, 1199 (1993) (finding that, where time for three year restriction had elapsed during course of litigation, injunctive relief was no longer warranted).

Finally, as First Health has not demonstrated probable success on the merits with respect to its claim that Norton breached § 8 of his Agreement, regarding customer non-solicitation, the Court need not address the likelihood of irreparable harm on this portion of the claim.

## 3. Tortious Interference Claims

With respect to the remaining claims of tortious interference with prospective and

actual contractual relations, First Health has failed to establish that its damages are anything other than monetary in nature. First Health focuses its irreparable harm argument on its imminent disclosure claim, which this Court has found to lack merit. There being no further argument that some other form of irreparable harm could ensue should the Court deny its motion for a preliminary injunction on the tortious interference claims, or any other claim, this Court finds that First Health has failed to establish irreparable harm.

### IV. Conclusion

First Health has not met its significant burden of demonstrating irreparable harm in the absence of injunctive relief. *See Adams v. Freedom Forge Corp.,* 204 F.3d 475, 484–485 (3d Cir.2000). It is unnecessary for this Court to continue in its analysis of First Health's motion for a preliminary injunction to weigh competing interests. Although First Health has established that it is likely to prevail on many of its claims against both Norton and NPA, because First Health has not adequately established that it would suffer irreparable harm in the absence of a preliminary injunction, this Court must deny First Health's motion for a preliminary injunction.

### ORDER

**AND NOW,** therefore, **IT IS ORDERED THAT** Plaintiff's Motion for Preliminary Injunction is **DENIED.**